UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HUGH CAMPBELL,

                                   Plaintiff,

                 -against-

IPSOFT INCORPORATED,

                                   Defendant.

---

18cv10684 (DF)

**MEMORANDUM
AND ORDER**

          In this employment-discrimination case, which is before this Court on consent pursuant

to 28 U.S.C. § 636(c), plaintiff Hugh Campbell ("Plaintiff") claims that defendant IPsoft,

Incorporated ("Defendant" or the "Company") violated his rights under the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 *et seq.,* and the New York City Human Rights Law

("NYCHRL"), Admin. Code § 8-107 *et seq*., by initially affording him an accommodation for his

known disability, but then largely revoking that accommodation and eventually terminating his

employment for discriminatory and/or retaliatory reasons.  In his Complaint, Plaintiff also

asserted claims of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, *et seq*. ("Title VII"), the NYSHRL, and the NYCHRL, but he has now voluntarily

withdrawn all of his race-based claims, and is seeking to proceed solely on his claims of

disability-related discrimination and retaliation, under federal, state, and local law.[1]

          Currently before the Court is a motion by Defendant for summary judgment (Dkt. 23),

seeking dismissal of all of Plaintiff's claims, in their entirety.  For the reasons discussed below,

---

[1] *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary
Judgment, dated Oct. 6, 2020 ("Pl. Mem.") (Dkt. 31), at 2 n.1 (noting that Plaintiff "has chosen
to withdraw" his race-based claims).

(1) the Complaint shall be deemed amended to strike Plaintiff's race-based claims as withdrawn, and (2) as to Plaintiff's disability-related claims, Defendant's summary judgment motion is denied.

## BACKGROUND

### A.   Factual Background

For purposes of the instant motion, the discovery record should be viewed in the light most favorable to Plaintiff.  That record reflects the following, with respect to the underlying facts of this case:[2]

### 1.   Plaintiff's Initial Employment With Defendant

It is undisputed that Plaintiff began working for Defendant in July 2009, in the position of Network Engineer.  (Def. 56.1 Stmt. ¶ 2; Pl. 56.1 Stmt. ¶ 2.)  It is further undisputed that, at that time, the parties entered into an Employment Agreement, which contained no reference to Plaintiff's having any disability or requiring any accommodation by reason of any disability. Def. 56.1 Stmt. ¶¶ 3-4; Pl. 56.1 Stmt. ¶¶ 3-4.)

According to Plaintiff, however, after having sustained a foot injury in 2005, he in fact had a physical disability at the time he started working with Defendant.  (*See* Complaint and Jury Demand, dated Nov. 15, 2018 ("Compl.") (Dkt. 1) ¶¶ 19, 50.)  Specifically, Plaintiff contends that he had difficulty standing and walking for extended periods without pain (*see* Declaration in

---

[2] On a summary judgment motion, the Court would ordinarily summarize the relevant facts by reference to the parties' submitted statements of undisputed facts, made pursuant to Local Civil Rule 56.1.  Here, however, Plaintiff purports to dispute nearly all of the "facts" set out in Defendant's Rule 56.1 Statement.  (*See generally* Defendant's Local Rule 56.1 Statement, dated Sept. 2, 2020 ("Def. 56.1 Stmt.") (Dkt. 23-1); Plaintiff's Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts, dated Oct. 6, 2020 ("Pl. 56.1 Stmt.") (Dkt. 33).) Under the circumstances, while the Court will still cite herein to the parties' Rule 56.1 Statements where useful, it has largely relied on its own review of the underlying record to determine the material facts, and to ascertain whether those facts are genuinely in dispute.

Opposition of Justin M. Reilly, Esq., dated Oct. 9, 2020 ("Reilly Decl.") (Dkt. 32), Ex. 1

(Transcript of deposition of Hugh Campbell, conducted Nov. 18 and 19, 2019 ("Pl. Dep.")

(Dkt. 32-2)), at 17, 38, 162), and that this would have particularly impacted his ability to

commute to and from the job during rush hours, as he had a very long commute (two hours in

each direction), and, at peak times, it was difficult for him to be assured a seat on the buses and

trains that he needed to take, to get to work and back (*see id.*, at 165-66, 196, 205, 213-14).

Although Defendant maintains that, "[w]hen he commenced employment by the

Company, Plaintiff never informed Defendant's Human Resources ["HR"] Department that he

suffered from any disability" (Def. 56.1 Stmt. ¶ 6), Defendant has provided no testimony or other

record evidence to support this, from anyone with personal knowledge.  At most, Defendant has

submitted a Declaration from HR Manager Yuan Chen ("Chen") (*see* Kreisberg Decl., Ex. Q

(Declaration of Yuan Chen, dated Aug. 27, 2020 ("Chen Decl.")), which states that, "[a]t no time

during [P]laintiff's employment by the Company did he ever provide any information or

documents to the Company's HR department stating that he had any disability of any kind" (*id*.

¶ 2).[3]  Yet, while Chen stated in her Declaration that she was employed by the Company "at all

relevant times" (*id*. ¶ 1), she testified at her deposition that she started with the Company in June

2012 (*see* Reilly Decl., Ex. 5 (Transcript of deposition of Yuan Chen, conducted Dec. 2, 2019

("Chen Dep.") (Dkt. 32-5)), at 7), nearly three years after Plaintiff commenced his employment.

---

[3] Certain paragraphs of Defendant's Rule 56.1 Statement, including paragraphs 6, 9, and
12, cite solely to "Kreisberg Declaration Ex. R" in support of the stated facts, but the Declaration
of Jeffrey L. Kreisberg in Support of Defendant's Motion For Summary Judgment, dated
September 2, 2020 ("Kreisberg Decl.") (Dkt. 24) contains no such exhibit.  Rather, the last
exhibit appended to that Declaration is the Chen Declaration, which is marked as "Exhibit Q."
(*See generally* Kreisberg Decl.)  The Court assumes that, where Defendant has cited to
"Exhibit R," it has actually meant to cite to Exhibit Q, as the Chen Declaration appears to speak
to the points raised in the Rule 56.1 Statement paragraphs in question.

Accordingly, Chen cannot speak from direct knowledge as to whether, at the time he started on the job, Plaintiff informed HR of his claimed disability.

In contrast, at his deposition, Plaintiff testified that he did, in fact, inform HR of his disability at the time he commenced employment with the Company.  (*See* Pl. Dep., at 42, 44-45 (testifying that, when he was offered the job, he met with Pearl Hahm ("Hahm"), from HR, and "told her about [his] disability").)  Plaintiff also testified that, when he met with Hahm and filled out forms, he had with him all of the information about his Worker's Compensation case that related to his foot injury, but, "after that, no one specifically asked [him] for any documentation, especially doctors' documentation."  (*Id.*, at 220-21.)  Plaintiff testified that he "would have been glad to submit that if somebody [had] asked."  (*Id.*, at 221.)

Moreover, apart from HR, Plaintiff testified that, even prior to his first interview with representatives of the Company, he informed Dustin Long, a recruiter with the Company (*id.*, at 25) that he had been "injured" (*id.*, at 34-35), that he "had a disability with [his] right foot"[4] (*id.*, at 37), and that he "would need an accommodation" (*id.*).  Further, Plaintiff testified that, at the initial interview itself, he informed Mike Ghicas ("Ghicas"), a principal of the Company (*id.*, at 28), that his disability made him unable to "walk long distances," to "carry and lift heavy things," and to "stand for too long" (*id.*, at 38).

Plaintiff did confirm in his testimony that, at the time of his initial job interview, he and Ghicas did not discuss the idea of Plaintiff's working from home.  (*Id.*, at 39.)  On this subject,

---

[4] In 2014, after he was employed by Defendant and while on a trip to London that he purportedly made because the Company "needed [him] to go," Plaintiff also allegedly injured his left foot.  (*See id.*, at 152, 219-20.)  Depending on the point in time in question, Plaintiff's testimony may thus refer to his disability as relating to an issue with his "foot" or to an issue with his "feet."  (*See, e.g., id.*, at 214-15 (testifying to discussion after Hurricane Sandy (which was in 2012) regarding "pain in [his] foot"), 198 (referencing 2016 discussion regarding "the issues that [he had] with both of [his] feet.").)

Plaintiff testified that, "[a]t that particular time," he and Ghicas "were talking about Plaintiff's working the "first shift," which would be from 7:00 a.m. to 4:00 p.m.  (*Id.*, at 39.)  Plaintiff explained that working that shift would have enabled him to get a seat for his lengthy commute, as he would leave his home at about 5:00 a.m. – before rush hour.  (*Id.*; *see also id.*, at 166.) Then, according to Plaintiff, Ken Martin ("Martin"), Director of HR (Def. 56.1 Stmt. ¶ 20), instead offered Plaintiff the "third shift," which was an overnight shift, starting at 10:00 p.m. (Pl. Dep., at 46, 49.)  Plaintiff accepted that offer, further explaining, at his deposition, that it was an even "better commute" for him.  (*Id.*, at 48.)  It is undisputed that, when Plaintiff began his employment with the Company, he worked at Defendant's main office at 17 State Street, in Manhattan.  (Def. 56.1 Stmt. ¶ 5; Pl. 56.1 Stmt. ¶ 5.)  It is also undisputed that, when he started on the job, Plaintiff did not request a work-from-home schedule.  (*Id.*)

## 2.  Plaintiff's Placement on a Full-Time Work-From-Home Schedule

At some point, however, identified by Plaintiff as in or about September of 2012 (*see* Pl. Mem., at 4 (citing Pl. Dep., at 137-38, 154)), Plaintiff began working from home, five days per week.  While Defendant contends that this change occurred in or about 2013, and that it was precipitated by a lack of office space (Def. 56.1 Stmt. ¶ 8), the document that Defendant cites as a supposed admission by Plaintiff on these points (Kreisberg Decl., Ex. D) actually reflects a statement by Plaintiff that he "was working from home . . . *[b]efore* they did not have any space in the office" (*id.* (email to Gavin Cullum from Hugh Campbell, dated May 28, 2016) (emphasis added)).[5]

---

[5] At his deposition, Plaintiff testified that "[t]here were issues with office space [] some time after [Hurricane] Sandy," and that, in connection with those space issues, Plaintiff received an instant message from his then-supervisor, Ben Case ("Case"), who "talked about . . . giving [Plaintiff's] seat to somebody else" and told Plaintiff, in that regard, "['y]ou're already working

Evidence in the record suggests that, at the time Plaintiff started working from home, he was placed on a new project, and that conversations about his role on that project led to the decision of his supervisors to allow him to work remotely.  (*See generally* Pl. Dep., at 154-72.) Defendant's proffered evidence does not refute Plaintiff's testimony that he started working at home for at least two reasons – that he would need to "work[] all hours of the day" on the newly assigned project (*see* Pl. Dep., at 162; *see also id.*, at 156 (describing Plaintiff's "need to synch up with people in Europe and Japan and India"); *id.* at 159 (same)), and that he would not have been physically able to perform an in-person role on the project (*see id.*, at 157-59, 162-63).  On the latter of these points, Plaintiff testified that, in conversations with Eric Sheedy ("Sheedy"), Executive Director of Global Operations, regarding "the specifics of the project and how [Plaintiff] would have to do it," Plaintiff "ma[de] sure that [he] wouldn't have to go on-site to the actual data centers, because of the condition of [his] foot."  (*Id.*, at 155-58.)  On this particular point, Plaintiff further testified:

> They have a data center in New York.  And I think they actually have two data centers in [New] Jersey.  So, that means, then, my commute that's . . . around two hours to get home, and around two hours to get back, will get increasingly longer, because then I would have to commute from the office also to these New Jersey data centers, and go there, and then literally go to every single rack and map out every single port.
>
> And I'd be standing, So, that means I'd be standing for hours and hours and hours upon days and there's no way that I could physically do anything like that.

(*Id.*, at 163.)

---

from home anyway,  you only come in . . . sometimes; so you might as well . . . just give up your seat and we'll just give you a temporary seat when you come in.[']"  (Pl. Dep., at 215-16.)

According to Plaintiff, Sheedy – having been made aware by Plaintiff of his disability –

told Plaintiff that he would be able to work "remotely," and that, "if there was anything else that

they needed from the data center, then the people on [Sheedy's] staff would actually go

there . . . ."  (*Id.*, at 157.)  Sheedy, for his part, did not deny that these conversations with

Plaintiff took place, but rather testified only that he had no recollection of them.  (*See* Reilly

Decl., Ex. 7 (Transcript of deposition of Eric Sheedy, conducted Nov. 20, 2019 ("Sheedy Dep.")

(Dkt. 32-7)), at 66-75.)  For example, Sheedy testified as follows:

> Q.    Well, during the time that [Plaintiff] worked for
> [Defendant], were you aware of whether or not he worked
> from home during any portion of his employment?
>
> A.    I don't recall the specifics around that.
>
> Q.    When you say you don't recall the specifics, what do you
> mean by that?
>
> A.    I don't know if he did or not.  I don't remember.

(*Id.*, at 70.)

> Q.    During the almost nine years of his employment, do you
> recall whether or not he ever worked from home at any
> point?
>
> A.    I don't remember any specifics around that stuff.
>
> Q.    You don't recall any conversations that you had with
> [Plaintiff] where he informed you that he had a physical
> disability?
>
> A.    I don't remember.

(*Id.*, at 72-73.)

> Q.    Do you recall at some point in September 2012 telling
> [Plaintiff] that he can work from home five days a week?
>
> A.    No, I don't recall that.

Q.     And you don't recall whether or not he worked from home
       five days a week in September 2012 going forward; is that
       right?

A.     No idea.

(*Id.*, at 75.)

In any event, it is not disputed by the Company that, in 2012, Plaintiff's position in the

Company changed to that of a Service Transition Engineer (in the Company's Service Transition

department), and that, by at least 2013, he started working from home in that position, with his

work-from-home schedule becoming "official" by 2014.  (*See* Def. 56.1 Stmt. ¶¶ 7-8, 10 (stating,

*inter alia*, that Plaintiff became a Service Transition Engineer in 2012; that "[i]n or about 2013,

Plaintiff began working from home"; and that "[i]n or about 2014, Plaintiff was officially

assigned to a work from home schedule"); *see also* Pl. Dep., at 138-39, 142-43.)  Defendant also

does not challenge that, as a Service Transition Engineer – a position Plaintiff held until at least

some time in May of 2016 – Plaintiff generally worked from home full time, commuting to the

office or engaging in other travel only as needed.  (*See* Pl. Dep., at 151-53.)

Plaintiff was first supervised in his new position by Case, who served as the head of the

Service Transition department, and then by Kristen McFadden ("McFadden"), who succeeded

Case in that position.  (*See* Pl. Dep., at 127, 142-43, 191; *see also* Sheedy Dep., at 23, 27-28;

52-53.)[6]  According to Plaintiff, both Case and McFadden knew of his foot condition and,

although they did not ask Plaintiff for any medical documentation of his disability, they were

accepting of his work-from-home schedule.  (*See* Pl. Dep., at 146, 154, 169, 172-73, 195, 211,

---

[6] Plaintiff's deposition transcript variably reflects the spelling of McFadden's first name as "Chris" (*see* Pl. Dep., at 97, 176, 193) and "Christian" (*see id.*, at 142, 173, 175).  Transcripts of the depositions of other Company employees, however, show her first name as "Kristen." (*See, e.g.*, Reilly Decl., Ex. 3 (Transcript of deposition of Jason Stewart, conducted Jan. 30, 2020 ("Stewart Dep.") (Dkt. 32-3)), at 31; Chen Dep., at 59-60; Sheedy Dep., at 23.)

220-21.)  Defendant has not introduced any evidence to counter these assertions.[7]  Nor has

Defendant offered any evidence to suggest that any employee needing an accommodation for a

disability was required, by Company policy, to direct an accommodation request to *HR* (as

opposed to the employee's supervisor) or to submit medical documentation.  Plaintiff, on the

other hand, has submitted a copy of the Company's "Employee Handbook" (*see* Reilly Decl.,

Ex. 8 (Dkt. 32-8)), which, in relevant part, states the following, under the heading "Reasonable

Accommodation":

> . . .  Reasonable accommodation may be, depending on all the
> circumstances, modification or adjustment to the work
> environment, the way things are usually done, or to remove non-
> essential functions of the job . . . .  *If an employee requires a*
> *reasonable accommodation, he/she should speak with their*
> *manager or supervisor.*  [The Company] encourages individuals
> with disabilities to come forward and identify any reasonable
> accommodations that may be necessary to effectuate performance
> of [] essential job functions.  The Company *may* request a
> physician's statement documenting the need for the requested
> accommodation and other pertinent information.  . . .

(*Id.*, at ECF 15[8] (emphases added).)

---

[7] The record also reflects that at least some of Plaintiff's colleagues at the Company were
aware that he generally worked from home.  (*See* Reilly Decl., Ex. 2 (Transcript of deposition of
Calvin Gabriel, conducted Dec. 16, 2019 ("Gabriel Dep.") (Dkt. 32-2)), at 32; Stewart Dep., at
31; Ex. 4 (Transcript of deposition of Paul Fagan, conducted Dec. 19, 2019 ("Fagan Dep")
(Dkt. 32-4), at 54-55.)  Moreover, the record shows that at least two of Plaintiff's co-workers –
Jason Stewart ("Stewart"), who had worked under Plaintiff (Stewart Dep., at 27-28), and
Calvin Gabriel ("Gabriel"), who was in another department, but had worked with
Plaintiff (Gabriel Dep., at 13-14, 26) – understood that the reason why Plaintiff had a work-from-
home schedule was that he had physical issues (*see* Stewart Dep., at 28-30 (Q.  Over the years,
did you come to learn that [Plaintiff] was working from home because he had physical issues
with his right foot and then his left foot?"  A. "My understanding is that there was a physical
issue with his feet.  I don't really recall what the specifics were, but yes."); Gabriel Dep., at 32
(Q. "Did you learn that [Plaintiff] had a work from home schedule because of the physical
problems with his feet?"  A. "He did mention that to me.")).

[8] Where the Court cites to a page by using the "ECF" prefix, the citation is to the page
number affixed to the document by the Court's Electronic Case Filing system.

### 3.      The Substantial Revocation of Plaintiff's Work-From-Home Schedule

In May 2016, an individual named Gavin Cullum ("Cullum"), who is now deceased, came to New York from the Company's London office, and took over the leadership of the Service Transition department from McFadden, who left the Company at that time.  (*See* Sheedy Dep., at 16-17, 23, 27; Pl. Dep., at 174-76.)  Plaintiff focuses most of his allegations of discriminatory and retaliatory animus on Cullum, whom he essentially describes as being intolerant of any employee who sought to work from home, as unyielding on the issue, and as not wanting to hear complaints about it.

Regardless of whether the Company did, or did not, have any formal policy regarding remote work,[9] several witnesses testified to the effect that, upon his arrival in New York, Cullum displayed an antipathy towards the idea of employees working from home and would say that the Company had no work-from-home policy.  For example, Gabriel, who served as the head of the Company's Applications department during the relevant time (*see* Gabriel Dep., at 13-14), testified as follows:

> Q.     Did [Cullum] have issues with anyone working from home?
>
> A.     Yes.
>
> Q.     What issues did he have with anyone working from home?
>
> A.     He said there is no work from home policy.
>
> Q.     Meaning you can't work from home; is that right?

---

[9] At the time of his deposition, Sheedy testified that the Company had nothing in writing that stated whether an employee could or could not work from home (Sheedy Dep., at 49), and he further testified to being unable to recall if he had ever seen anything in writing from the Company as to whether it did, or did not, have a work-from-home policy (*id*.).

A.      Yes.

(*id*., at 50).  Similarly, Stewart testified that Cullum "would often refer to [Defendant's] policy of

not having a real policy on working from home" (Stewart Dep., at 37); Paul Fagan ("Fagan"),

who served as Program Manager in the Service Transition department (Fagan Dep., at 16),

acknowledged in his testimony that Cullum made "pretty clear as the head of [S]ervice

[T]ransition that he didn't want anybody working from home" (*id.*, at 71); and Brynn Ireland

("Ireland"), who joined the Company in 2017 as the head of the project management side of the

Service Transition department (Reilly Decl., Ex. 6 (Transcript of deposition of Brynn Ireland,

conducted Nov. 21, 2019 ("Ireland Dep.") (Dkt. 32-6)), at 8, 14-15), confirmed that the direction

given to him by Cullum was that "working from home was discouraged" (*id.*, at 26).

          The deposition testimony that has been presented to the Court also suggests that Cullum

took the position that everyone in his department needed to be physically present, in the office,

five days per week, during at least the hours of 9:00 a.m. to 6:00 p.m.  (*See* Stewart Dep., at 36

(Q. "Okay, now [Cullum] comes along.  Does [Cullum] want everyone to come to the office to

be there, physically present, five days a week from at least 9:00 A.M. to 6:00 P.M.?"  A. "That's

what he expressed to us."); *id.*, at 80 (Q. "But you do know that [Cullum] wanted his architects

and senior engineers and others to be physically present every single day in the office; is that

correct?  A. "Correct.")); Ireland Dep., at 93-94 (Q. "For [Cullum], was he by the book, he

wanted you physically in the office every day from [9:00] A.M. to [6:00] P.M.?"  A. "Well,

before [9:00] A.M., but, yeah.  By [8:45] you better be in the office."); Fagan Dep., at 41

(Q. "Did [Cullum] want everyone in the office working between the hours of 9:00 a.m. and

6:00 p.m. at least?"  A. "Yes.").)

There is also testimony in the record that, while the view that it would be preferable for all employees to be present, full-time, in the office may have originated with the President and Chief Executive Officer of the Company, Chetan Dube ("Dube") (*see* Sheedy Dep., at 12, 118-19), it was Cullum and one of Cullum's subordinates, Craig Morrow ("Morrow") – who joined the Service Transition department in August 2017 to manage its technical side (*see* Fagan Dep., at 24) – who sought to enforce this as a requirement (*see* Fagan Dep., at 41 (Q. "Was it your understanding that the [C]ompany didn't want people working from home?"  A. "Yes."  Q. "Was [Cullum] the one that enforced that policy that he didn't want anyone working from home in his department?"  A. "I think he was enforcing it from the top down, but yeah, he would be the manager in our area that would have enforced it."); *see also id*. (Q. "What about [] Morrow?  Do you know if he was one that was enforcing that policy from the top down, that no one could work at home?"  A. "I believe he was.").)

Plaintiff testified that, at about the time when Cullum took over for McFadden as head of the Service Transition department, Plaintiff went into the office to meet with Cullum.  (Pl. Dep., at 173-75.)[10]  Plaintiff further testified that, during that meeting, he explained to Cullum that he had been working at home since September of 2012; he "explained everything that was going on with [his] foot"; and he "explained the commutes that [he] had to take."  (*Id.*, at 178.)  In fact, according to Plaintiff, he even showed Cullum his foot.  (*Id.*)  Plaintiff testified that Cullum told

---

[10] Although, at his deposition, Plaintiff testified that this meeting took place on or about May 26, 2016 (*see id*.), the remainder of his testimony suggests that – assuming the meeting in fact occurred as described – it likely occurred a few days earlier than that, as the email Plaintiff testified that he received from Cullum subsequent to the meeting is dated May 23, 2016 (*see infra*).  It appears that Plaintiff may have eventually recognized that the timeline to which he initially testified was in error, as, later in his deposition, upon being shown the May 23 email, he testified, "As I stated earlier, I had a conversation with [Cullum] on or around May 26th, and we had our initial conversation, obviously looking at this – [t]hen we had a discussion before this particular date."  (*Id.*, at 203.)

him that he wanted Plaintiff to serve as an "architect" on Cullum's team,[11] and that "he would

like . . . architects in the office," but that he nonetheless understood "the issue of [Plaintiff's]

disability."  (*Id.*, at 179.)  Plaintiff purportedly left the meeting thinking that he "would have to

go into the office a little bit more."  (*Id.*; *see also id.*, at 197 (testifying that he and Cullum agreed

that Plaintiff would "come into the office . . . for specific meetings").)

Plaintiff also testified, however, that, after the meeting, he received an email from

Cullum that did not acknowledge Plaintiff's claimed disability.[12]  In this email, dated May 23,

2016, Cullum told Plaintiff, on May 23, 2016, that he "underst[oo]d from HR that an

arrangement was put in place for [Plaintiff] to work from home due to personal reasons."  (Reilly

Decl., Ex. 9, at ECF 3.)  In this email, Cullum did not explain what he meant by "personal

reasons," and did not otherwise refer to any potential disability.  Cullum, though, went on to

state:

> Going forward, I would like to revisit that arrangement and ask for
> anyone who works from home to now come back into the office.  I

---

[11] In its Rule 56.1 Statement, Defendant represents that, "[i]n or about May 2016,
Plaintiff's position was upgraded from Service Transition Engineer to Architect" (Def. 56.1
Stmt. ¶ 13), and, in his testimony, Plaintiff described the architect position that Cullum had
purportedly offered to him (and that he had purportedly accepted) as constituting a new and
potentially more lucrative role for him (*see* Pl. Dep., at 191, 194-95).  Along these lines, Ireland
testified that the most "senior" and "respected" people in the department were made "architects,"
and those people were then expected to "provide [] guidance and leadership to the younger junior
engineers."  (Ireland Dep., at 105-06.)  The Court notes, though, that Sheedy suggested, in his
testimony, that the role of a "Service Transition Architect" was not functionally different than
that of a "Service Transition Engineer" (*see* Sheedy Dep., at 98), and, in fact, he expressed doubt
as to whether the Company even used the job title of "Architect" (*see id.*, at 25-26; *see also*
Stewart Dep., at 25-26 (suggesting that the architect position was created, in the Service
Transition department, when Cullum came on board)).

[12] Although both parties have submitted this email and the related email string as exhibits
to their respective counsel declarations (*see* Kreisberg Decl., Ex. D (Dkt. 24-5); Reilly Decl.,
Ex. 9 (Dkt. 32-9)), the pages of Defendant's submitted exhibit appear to be out of order, and
thus, for clarity, the Court will cite to Plaintiff's exhibit going forward.

> appreciate this will be a change and I am happy to discuss this
> further to see what we can do to accommodate you.
>
> Please let me know as I need my Architect to be visible and
> available from the office.

(*Id.*, at ECF 3-4.)[13]

Plaintiff responded to Cullum's email on May 24, 2016, stating that he "completely underst[oo]d [Cullum's] reasoning, especially since the [Architect] position [was] new," but explaining that he had started working from home "due to a combination of" factors, which he listed as follows:

- 4 hour commute a day (2 hours to & from work)

- Foot issues (I have had foot issues since my disability back in 2005[,] so constant long commutes are not my friend)

- Compensation (I have not been paid for any of my transitions or POCs[,] and WFH [work from home] is a less expensive monthly cost)

- Working on a lot of transitions outside of normal US business hours in addition to my reg[ular] hours

- Etc.

(*Id.*, at ECF 3.)  At the end of the same email, Plaintiff added, "We can discuss this.  Based on our face-to-face talk[,] I imagined I would have to come in a little more but not every day (well not until a base Salary change next year).  . . ."  (*Id.*)

---

[13] In his opposition to Defendant's summary judgment motion, Plaintiff contends that, in light of Cullum's death, none of the statements made by Cullum in any of his emails are authenticated, and, further, that they constitute inadmissible hearsay.  (*See generally* Pl. 56.1 Stmt.; *see also* Pl. Mem., at 17-18.)  As necessary, the Court will address Plaintiff's evidentiary contentions below, but, as relevant to the email quoted above, it should be noted that Plaintiff concedes that he received the emails from Cullum that were addressed to him, and that there appears to be no dispute that the statements contained therein were made.

In response to this, Cullum sent Plaintiff another email, on May 27, 2016, stating:

> Apologies for my delayed response but I wanted to get something back to you before the weekend.
>
> After reviewing your points with HR, there is nothing defined where you were working from home due to disability or compensation requirements.  I also appreciate that you may have been given the choice to work from home when the office was getting too full.
>
> However, I require my architects to be in the office.  There is a need for them to work with the team and act as mentors. Unfortunately, I do not have any room to move on this and even if you remain in the same capacity as a STE [Service Transition Engineer], I would still want you back in the office.
>
> I appreciate this is a change and I am willing to look at a phased approach but ultimately I'm having everyone who works from home [] come back to the office.

(*Id.*, at ECF 2-3.)

By email dated May 28, 2016, Plaintiff responded by stating, in relevant part:

> I will be in the office next week.  I was already planning on coming in more.  I just wanted to be upfront regarding why I was working from home.  I was working from home nearly a year before it became official in 2014.  Before they did not have any space in the office.  I'm aware with the new position I have to be in the office.  It will take some getting used to but I've already started preparing myself for this adjustment.  . . .

(*Id.*, at ECF 2.)

Plaintiff testified that, after this exchange, he met with Cullum again, and, at that time, Cullum backed off of his insistence that Plaintiff be present in the office five days per week, agreeing that Plaintiff could work from home three days per week.  (Pl. Dep., at 181; *id.*, at 197 (testifying, "we agreed . . . that I would be only coming into the office two days a week"); *see also id*. ("the agreement was verbal, face-to-face").)  Then, according to Plaintiff, after more time went by, Cullum returned to informing Plaintiff that he "need[ed] him in the office five

15

days a week," and when Plaintiff told Cullum that he could not do that, as it would be "too much on him," Cullum again relented and responded, "all right, all right, all right, let's just do three days a week [in the office]" – a modified schedule to which Plaintiff again agreed.  (*Id*., at 181, 198.)  Plaintiff conceded, at his deposition, that, when he accepted the Architect position from Cullum, he knew that the functions of that position would require him to spend more time in the office than he had been spending in his former position under Case and McFadden, but he further testified that this was why they had come to an agreement about his schedule, and he stated that he had been "open and honest with [Cullum] regarding . . . the issues that [he had] with both of [his] feet."  (*Id*., at 198.)

Then, after purportedly reaching an agreement that Plaintiff would work certain days from home, Plaintiff asserts that Cullum started to "put[] things" on the calendar, which "kind of forc[ed] [Plaintiff] to come in five days a week."  (*Id.*, at 182 (testifying "it just starts alternating between three days a week, and then . . . it's five days a week"); *see also id.*, at 225-26 (". . . I had to come in two days a week originally.  And then, it was I would have to come in three days a week, then he would force me to come in five days").)  Plaintiff also testified that, at some point, Cullum "all of a sudden" wanted him to "alternate the days" for his three days per week.  (*Id.*, at 182 (testifying, "And so, I'm hearing things like, you're not here on Wednesday – you were here last Wednesday, you're not here this Wednesday.  And then, it just kept going and going and going"); *see also id.*, at 230 (testifying that, although his work-from-home days, at that time, were supposed to be Wednesdays and Thursdays, if he happened to go in to work one of those days, he'd be given an alternate day to work from home, usually a Friday, but "[Cullum] didn't like that you have a Friday, because he thinks, hey, you're going to have a three-day weekend[,] [s]o, sometimes that alternate day would be moved to another week, if they allowed

it"); *see also id.*, at 226 (". . . they would schedule me to come in sometimes on one of my work-from-home days . . ., and then I was supposed to get an alternate, which sometimes they just completely denied").)

Plaintiff testified that, in an effort to preserve Wednesdays and Thursdays as his work-from-home days, he started sending out emails to his team, early in the mornings on those days, telling them that he would be at home.  (*See id.*, at 229.)  On one such occasion, on March 2, 2017 (a Thursday), he sent out an email that simply said "feeling sick today" (Kreisberg Decl., Ex. E (Dkt. 24-6)), explaining in his testimony that the intent of the email was "just [to] inform[] everybody that [he would be] working from home" (Pl. Dep., at 226-27; *see also id.*, at 228 (testifying, "I'm not going to send an e-mail to seven people, including my peers, [saying] hey guys, I have a disability and Wednesdays and Thursdays are my disability days.  . . . No one sends a message like that").)  In response, though, Plaintiff received an email from Peter Morgan ("Morgan"), a Service Transition Manager, stating, "I'm noticing a reoccuring pattern whereby you report that you're sick but are continuing to work from home – this is now the second time this week alone."  (Kreisberg Decl., Ex. E.)  Morgan informed Plaintiff that, going forward, if he were "not feeling well" and "cho[]se to stay at home," the day would be "logged as a sick day."  (*Id.*)

In describing the difficulties that he had with being required to keep reporting to the office, Plaintiff testified that, on one particular day in October or November of 2016, when he "was forced to come in on [] one of [his] work-from-home days," he became "faint," and that he was "in such pain with the commute" that he "was curled over and [he] felt like [he] was going to pass out and die."  (*Id.*, at 231.)  He further testified that he "was given Wednesdays and

17

Thursdays as [his work-from-home] days because they saw just in how much pain [he] was."
(*Id.*, at 231-32.)

### 4.    Escalation of Conflict

It generally appears, from the discovery record, that the initial conflict between Plaintiff
and Cullum regarding Plaintiff's work-from-home schedule escalated over the months following
their initial discussions on the subject in May 2017.  The evidence suggests that Cullum made it
known that he did not like the fact that Plaintiff had any type of work-from-home schedule (*see*
Stewart Dep., at 80), as he wanted his architects and senior engineers to be physically present in
the office every day (*see id.*).  Further exacerbating the tensions between the two men over this
issue was the seemingly questionable management style of Morrow, who, as noted above, joined
the Service Transition department in August of 2017.  As also noted above, there is evidence in
the record that Morrow, acting under Cullum, undertook to enforce the requirement that all
employees in the department work, in-person, in the office, during set hours.  (*See* Fagan Dep.,
at 41.)

### a.    The October 4, 2017 Meeting With Morrow

According to Plaintiff, on or about October 4, 2017, Morrow berated him in a meeting
that Plaintiff had joined by telephone, "demean[ing]" Plaintiff by calling him "lazy,
unresponsive, and a bad employee."  (Pl. Dep, at 232-33.)[14]  Plaintiff testified that, at this
meeting, Morrow told him "no one [could] reach [him]" by email or other electronic means and

---

[14] Although, as noted above, Plaintiff is no longer pursuing his race-discrimination claims
(*see supra*, at n.1), he testified at his deposition that, at this meeting, Morrow "demean[ed] [him]
using just the stereotypical things people think about black people, that [they're] lazy,
unresponsive, that [they] don't respond to people" (Pl. Dep., at 234; *see also id.*, at 236 ("[W]hat
does he mean by 'people like me'?  Black people?  People with a disability?  People with a
disability that need to work from home?  I don't know what [']people like me['] means.  Because
he says, 'people like me are the worst.'").)

that "[n]o one kn[ew] where[he was], because [he was] not there face-to face."  (*Id.*, at 234.)

Further, Plaintiff testified that Morrow told him "that [he was] going to take away [Plaintiff's]

work-from-home days because [] Dube [did] not have a work-from-home policy."  (*Id.*, at 235.)

By Plaintiff's account, Morrow went on to say that he was going to give Plaintiff the following

"ultimatum":

> . . . either you're going to do everything, everything that I ever
> said, and tell you to do ever; or you go to another department; or
> we're going to have another conversation, and execs and people
> are going to tune in.  And the, we're going to let you go and fire
> you.

(*Id.*)  Plaintiff testified that Morrow's conduct at this meeting and his various criticisms – which

Plaintiff described as having been made on a speakerphone, such that anyone walking by could

hear – made him "embarrassed and livid" (*id.*, at 238), but that, at the time, he simply responded

by saying "I understand what you're saying.  I'm going to digest it, and I will get back to you"

(*id.*, at 237-38 (explaining that this was a phrase that his former supervisor, Case, had taught him

to use in circumstances when he did not want to promise something to a client)).

Stewart, who was present for the meeting, confirmed that Morrow had addressed Plaintiff

at the meeting in a "condescending" and "offensive tone."  (Stewart Dep., at 50-52.)[15]  The only

evidence to the contrary consists of a note seemingly authored by Morrow on October 4, 2017,

and then emailed from Morrow to Cullum, in which Morrow appears to have written:

> I blended the good with the bad making it clear to him he was
> setting a bad example with how unavailable he is when he is
> working from home.  Also explained to him his comp days were

---

[15] Although not directly relevant to what occurred at this particular meeting, the Court
notes that there is also testimony in the record suggesting that Morrow had demeaned others in
the Service Transition department and created a "toxic" environment in the department.  (*See*
Fagan Dep., at 43 (testifying that Morrow had acted in a demeaning manner towards him);
Stewart Dep., at 48-50 (testifying that, "the way [Morrow] behaved to people, I would say it
caused a toxic environment").)

> not going to be approved.  We all work late and on weekends and
> in many cases, it's a time management issue.  I explained if I
> approved this for him it would pour a beacon of light on him that
> he does not want.  I also explained he is hugely valuable and I am
> hoping he can make some changes to start lighting things up and
> being a true leader on the team.
>
> I was disappointed with his reaction which was pretty
> condescending as he said 'I will think about it and we will meet up
> to discuss later'.  It was subtle but nonetheless, a bit shocking.  I
> was hoping for something that highlighted his desire to make
> things right.  I also explained this was the last informal discussion
> and if it didn't get corrected, more formal conversations would
> need to be had.  I did it in a very supportive, don't shoot the
> messenger type of manner so he didn't feel like he was being
> cornered, etc.
>
> Just wanted to let you know.

(Kreisberg Decl., Ex. F (Dkt. 24-7), at ECF 1-2.)[16]  Morrow, however, did not himself provide

testimony in this action (*see* Pl. Mem., at 8 n.6 (stating that Morrow failed to respond to a

deposition subpoena)), and, as discussed below, the written account submitted by Defendant

cannot itself be considered for the truth of what transpired at the meeting.[17]  Nor can this written

account be considered for the truth as to whether Plaintiff was, in fact, "unavailable" when he

was working from home.

On the question of whether anyone who worked directly with Plaintiff ever found him to

have been "unresponsive" or "unavailable" during his work-from-home days, or ever made any

complaints about such issues, the record contains conflicting evidence.  While Ireland testified

that both Fagan and Stewart, in particular, had come to him on several occasions to complain that

---

[16] In its Rule 56.1 Statement, Defendant erroneously attributes these statements to Cullum (*see* Def. Rule 56.1 Stmt. ¶ 16), when the document, on its face (setting aside any issue of its admissibility), shows them as having been made by Morrow.

[17] *See* Fed. R. Evid. 801; *see also* Discussion, *infra*, at Section I(A)(1).

Plaintiff was unresponsive, had failed to attend meetings, or was significantly late to meetings (*see* Ireland Dep., at 69-75, 115), neither Fagan nor Stewart corroborated that testimony.  To the contrary, Stewart testified that he could not think of any times when Plaintiff was not available for meetings, was late to meetings, or was unresponsive (*see* Stewart Dep., at 62-64, 76-78), and Fagan similarly testified that could not recall any problems with Plaintiff's attendance at meetings (Fagan Dep., at 56), that Plaintiff had always been responsive to his communications, whether by text message, instant messaging, or phone (*id.*, at 57), and that Fagan had never made any complaints to anyone about Plaintiff (*id.*, at 89).  Moreover, although Ireland testified that the "perception around management at that time" was that, by working from home, Plaintiff "wasn't nearly as available as he was when he was in the office," he added to his testimony that he "[did not] know how much of that [was] true" (Ireland Dep., at 69), and stated that he had never personally been at any meetings that Plaintiff had failed to attend or to which Plaintiff had arrived late (*id.*, at 115).

### b.      Plaintiff's Request For a Transfer to a Different Department

On October 5, 2017, the day after the meeting with Morrow, Plaintiff wrote a lengthy email to Ghicas, Cullum, Sheedy, and Martin (of HR), with the subject line "Request for Transfer."  (Kreisberg Decl., Ex. H (Dkt. 24-9).)  In this email, Plaintiff recounted having received an "ultimatum regarding his job from [] Morrow," and stated that, in his "17 years of IT, [he had] never received an ultimatum," and had "never had [his] work ethic, reachability/accessibility to [his] peers, ability to determine what is a priority (and what should be [his] focus) and who [he was] fundamentally as a person questioned and put down."  (*Id.*)  Plaintiff stated that he was "beyond livid," and that he felt "disrespected and unappreciated for the work that he [did] and the pride [he] show[ed] to [his] work."  (*Id.*)  He described, in detail,

several criticisms that he claimed had been directed to him by Morrow at the meeting, including,

*inter alia*, that "nobody kn[ew] where [he was] or what [he was] doing"; that he could "not be

reached" via email, phone, or by various other remote means "by any of [his] peers"; that, "no

matter the reason," he was "expected in [the Service Transition] department to work [his]

weekends, nights, double[]shifts, [and] vacations and not get any comp time back as that [was]

the role"; that his position did "not have a shift" (which Plaintiff claimed was contrary to what he

had been told); that he was "not somebody [Morrow could] truly rely on"; and that, "unless [he]

compl[ied] with everything [Morrow] ever [told him, he] would not have a role."  (*Id*.)   In his

email, Plaintiff asked to have "no direct conversations with [] Morrow at any time in the future."

(*Id*.)  He also asked for "an immediate removal from Service Transition . . . or that the

[C]ompany let[] [him] go."  (*Id*.)

On the subject of this email, the Court has not been presented with any deposition

testimony from Martin, but it has been provided with deposition testimony from Chen, who, by

that time, was working in the HR department under Martin.  (*See* Chen Dep., at 10.)  Chen

confirmed that she had received a copy of Plaintiff's October 5, 2017 email (*id.*, at 118), but

testified that she spoke to neither Plaintiff nor Morrow about the matters that Plaintiff had raised;

that she was unaware of whether Martin spoke to either of them; that she conducted no

investigation of the matter; that she was unaware of whether anyone else in HR conducted any

investigation; and that she could not recall whether she made any inquiries as to whether there

were any other departments into which Plaintiff could transfer  (*id.*, at 119-23).

In any event, the record is clear that Plaintiff was not transferred out of the Service

Transition department (*see* Ireland Dep., at 172), although there is some indication in the record

that, at some point, Plaintiff may have been moved out from being under Morrow's management,

and directed to report to Fagan instead (although this would not have prevented him from having contact with Morrow) (*see id.*, at 97-101).

### c.   Plaintiff's Purported "Lateness" and "Gossiping"

Apart from the incident with Morrow, Fagan testified that, at around the same time (*i.e.*, in October of 2017), Cullum instructed him to inform Plaintiff that he could no longer work from home. (Fagan Dep., at 106.)[18]  After that, according to Fagan, he was further instructed by Cullum to collect logs showing the times that Plaintiff was swiping into the office in the morning, on the days when he came in.  (*See id.*, at 94.)  Fagan testified that those logs, which have not been submitted to the Court, showed that, on days when Plaintiff was supposed to be in the office, he was arriving later than 9:00 a.m.  (*Id.*, at 97.)  Despite this, Fagan, who had been working with Plaintiff on a daily basis, testified to his belief that Plaintiff had actually been working before 9:00 a.m. (as well as after 6:00 p.m.).  (*Id.*, at 96.)[19]  Fagan further testified that Cullum probably would have seen time-stamped emails that would have demonstrated this, but that, in any event, he told Cullum that, as Plaintiff's supervisor, he thought Plaintiff was putting enough time in on the job.  (*Id.*, at 96-97.)  Nonetheless, according to Fagan, Cullum "wanted to look at [the logs] anyway."  (*Id.*, at 97.)  Fagan testified that, in "hindsight," he believed that

---

[18] Although Fagan further testified that he, in fact, told Plaintiff that he could not work from home any longer (*id.*), there does not appear to be evidence in the record that this directive was enforced and that Plaintiff starting going into the office five days a week in October 2017.

[19] Stewart, who worked directly with Plaintiff, similarly testified to his understanding, based on emails and text messages that he had received from Plaintiff, that Plaintiff tended to work a significant number of hours, including hours well outside the period from 9:00 a.m to 6:00 p.m.  (*See, e.g.*, Stewart Dep., at 82-83 (testifying, for example, to "one specific incident where [Plaintiff] had to do some replacement file thing in Excel, and . . . he had been working all night trying to get it done," and describing this as "a pattern").)

Cullum had instructed him to collect the logs so that Cullum could use them as a basis for firing Plaintiff.  (*Id.*, at 139.)

Ireland also testified about the logs, and about what they showed.  (*See* Ireland Dep., at 122-31.)  According to Ireland, they reflected that "[a] significant majority of the time[,] [Plaintiff] would come in [15] to [30] minutes late."  (*Id.*, at 127.)  Ireland also testified, that, in his view, the requirement that Plaintiff arrive at the office by 9:00 a.m. actually meant that he needed to arrive earlier than that, because of "the meetings that he was involved in that needed his clear attention."  (*Id.*, at 128-29; *see also id.*, at 93-94 (Q. "For [Cullum], was he by the book, he wanted you physically in the officer every day from [9:00 a.m.] to [6:00 p.m.]?"  A. "Well, before [9:00 a.m.], but, yeah.  By [8:45] you better be in the office."); *id.*, at 136-37 ("Arriving at [9:00 a.m.] in my mind would still be considered late if you have a meeting that starts at [9:00] . . . .  The expectation is you should be prepared at your desk, laptop turned on, documents required ready to speak by [9:00 a.m.].")  Accordingly, Fagan appeared to take the position that, for Plaintiff to have arrived at the office in a timely fashion, he would have generally needed to arrive at 8:30, 8:45, or 8:50 a.m.  (*See id.*, at 129.)  Fagan further testified that, if Plaintiff had ever chosen to go into the office on one of his scheduled work-from-home days, in order to attend a meeting or for some other reason, he would have been expected to arrive at the office on that day "by [9:00 a.m.], unless there was a very clearly communicated reason for [his] being late."  (*Id.*, at 126-27.)

The record also contains an unauthenticated email dated October 18, 2017, seemingly from Cullum to Martin in HR (although this is not entirely clear), stating that Cullum needed to bring to Martin's attention that Plaintiff was "constantly gossiping about his situation," and that this was "causing damage to [Cullum's] team and damage to [the Company] which must stop."

(Kreisberg Decl., Ex. I (Dkt. 24-10), at ECF 2.)  According to the email, "several people [had told Cullum] that [Plaintiff was] bad[-]mouthing [Service Transition] management and telling anyone his situation who [would] listen."  (*Id.*)  The email also states that "[t]he latest infringement" came from an employee named Jennifer [Jenn] DeVries ("DeVries"), who had purportedly gone to Cullum on that day (October 18) "to voice her concern."  (*Id*.)  According to the email, DeVries "said that [Plaintiff] was saying a lot to her in a corridor with people listening which was extremely sensitive information."  (*Id*.)  The email concluded that "[w]e cannot tolerate this behaviour," with Cullum expressing the view that he "hope[d] something [would] be done."  (*Id*.)

Not only does the presented discovery record contain no testimony from either Cullum or Martin, but it also contains no testimony from DeVries, to confirm what she did, or did not, hear Plaintiff say.  Nor is there testimony from anyone else who claimed to have direct knowledge of any "gossiping" by Plaintiff, much less "constant" gossiping.  Indeed, the only witnesses who testified on this subject did *not* indicate that they, themselves, had heard Plaintiff "bad-mouth" anyone; they identified no one other that DeVries who had reportedly heard Plaintiff engage in "gossip"; and they confirmed that they had no firsthand knowledge of DeVries' complaint.  (*See* Ireland Dep., at 102 (confirming that DeVries was the only person with "firsthand knowledge" of the reported "gossiping"); Fagan Dep., at 98-100 (confirming that he never spoke to DeVries or conducted any inquiry into the "water cooler talk," by which Plaintiff was supposedly "badmouthing the department"); Sheedy Dep., at 192 ("I never talked to Jenn De[V]ries about it."); Chen Dep., at 136 (testifying that she did not speak to DeVries about the matter, and did not know if Martin ever did so)).

The only witness who testified to having engaged in any inquiry into Plaintiff's supposed "gossiping" was Ireland, who testified that he spoke to DeVries, Fagan, Morrow, Cullum, and Sheedy regarding this issue.  (Ireland Dep., at 87.)  According to Ireland, Fagan told him that "[Plaintiff] was upset, didn't like [Morrow] at all, wanted to move out of the department, or not report to [] Morrow anymore, and that [Plaintiff's] frustration was boiling over."  (*Id.*, at 89.) Ireland did not testify, however, that Fagan personally reported having observed Plaintiff engaging in any inappropriate behavior.  (*See id.* (testifying only that Fagan told him that Plaintiff's frustration could "potentially" have led Plaintiff to say things that were unprofessional).)  As for Ireland's conversation with DeVries, Ireland testified that DeVries said that she had "overhead" Plaintiff, somewhere in the "passage" (which Ireland "ha[d] to believe was outside her office"), "being rather animated and putting [Morrow] down."  (*Id.*, at 90.) Ireland provided no details as to the comments that DeVries reportedly overhead, but rather testified, without any specifics, that he believed the comments "went further than just [Morrow]," and related to "the department overall," including "issues with [] Cullum himself." (*Id.*, at 102.)  Ireland also testified, though, to his understanding that DeVries "personally was only aware of the one occasion."  (*Id.*, at 103.)

### d.     Plaintiff's "Warning Notice" and His Further Communications With HR

On October 31, 2017, Plaintiff was given an "Employee Warning Notice," ostensibly to "once again bring to [his] attention ongoing deficiencies in [his] conduct and/or performance." (Kreisberg Decl., Ex. J (Dkt. 24-11).)  The Notice, which was drafted by Ireland (*see* Ireland Dep., at 122), stated that its intent was "to define for [Plaintiff] the seriousness of the situation so that [he could] take immediate corrective action" (Kreisberg Decl., Ex. J).  Specifically, the Notice listed two reasons for the warning:  "Gossip" and "Lateness."  (*Id.*)  As to the former, it

26

merely stated that the corrective action that was required would be to "[s]top gossiping." (*Id.*)
As to the latter, it stated that Plaintiff's "core working hours" were from 9:00 a.m. to 6:00 p.m.,
and that, "between those hours," Plaintiff would "need to be present and reachable on the days
that [he was] required to be at work" and "available via email, phone and [instant messaging]"
on his allocated work-from-home days. (*Id.*; *see also* Ireland Dep., at 109.)

It is undisputed that, at 5:03 p.m. on the same day that he was given this Warning Notice,
Plaintiff sent an email to Chen, in HR, responding to the criticisms he had received. Although
Defendant has submitted a copy of Plaintiff's October 31 email with its motion (*see* Kreisberg
Decl. Ex. K (Dkt. 24-12)), the email itself refers twice to its having "attachments" (*see id.*, at
ECF 1 ("please . . . add these attachments and this email into the records"), ECF 2 ("[a]s
mentioned in . . . some of the Attachments supplied . . ."); *see also* Chen Dep., at 151
(confirming that the mail had attachments)), and Defendant did not include those attachments
with its exhibit. Accordingly, the Court has instead considered the version of the email
submitted by Plaintiff (*see* Reilly Decl., Ex. 13 (Dkt. 32-13)), which is the same email, but which
includes a number of additional documents, represented by Plaintiff to have been the attachments
(*see* Pl. 56.1 Stmt. ¶ 22). Those attachments include, *inter alia*, a copy of the May 24, 2016
email that Plaintiff had sent to Cullum, stating that he had originally started working from home
"due to a combination of reasons," including his "[f]oot issues." (*See* Reilly Decl., Ex. 13, at
ECF 6; *see also* Pl. Dep., at 263-64.) In the body of the October 31 email, Plaintiff also stated
that, since 2011, he had been scheduled for a 7:00 a.m. to 4:00 p.m shift, but that he had always
adjusted his hours as necessary for the projects to which he was assigned. (*See* Reilly Decl., Ex.
13, at ECF 1-2.) He also wrote that he had come into the office on days that were supposed to
have been his work-from-home days, and that, "since the face[-]to[-]face meetings early in the

morning ha[d] stopped," he had sometimes been arriving at the office around 10:00 a.m., as he had needed to "work extra hours to cover for the lack of 'technical' resources that [he] was being provided on [his] projects."  (*Id.*, at ECF 2-3.)

By email dated November 1, 2017, Chen responded to Plaintiff (*see* Kreisberg Decl., Ex. K, at ECF 1), telling him, *inter alia*, that Ireland wanted Plaintiff to work during the "regularly scheduled hours" of 9:00 a.m. to 6:00 p.m., both during his days in the office, and on his work-from-home days.  (*Id*.)  Chen stated that Plaintiff's "corrective action" would be to work those regularly scheduled hours, and "to refrain from speaking negatively of [his] department," so as to avoid "driv[ing] down morale."  (*Id*.)   Despite this response, Chen testified at her deposition that she did not know the basis of the allegation that Plaintiff had been "gossiping" (*see* Chen Dep., at 147 (Q. "Is it safe to say you know nothing about the gossiping that's being alleged here for the reason for the warning?"  A. "I don't know the reason for the gossip."  Q. "You have no firsthand knowledge; right?"  A. "No idea."), and that she also had no firsthand knowledge of Plaintiff's lateness (*see id*. (testifying, "I have personally never experienced his being late")).

### e.      Plaintiff's Replacement as Lead Architect on the "Moody's" Project

In at least the second half of 2017 and beginning of 2018, the largest project in the Service Transition department was a project that was being performed for Moody's, a client of the Company.  (*See* Ireland Dep., at 34-35; Fagan Dep., at 27-28; Sheedy Dep., at 85-86.) During that period (up to the date of his termination), much of Plaintiff's time had been devoted to that project.  (Pl. Dep., at 251, 258.)  In December 2017, however, while Plaintiff was on approved paid time off ("PTO") from work, he was replaced as the lead Service Transition

Architect on the Moody's project by another Architect, named Olga Hryshkevich

("Hyrshkevich").[20]  (Kreisberg Decl., Ex. M, at ECF 3; Fagan Dep., at 112-13.)

According to Fagan, Olga had already joined the team by December 21, 2017, when

Fagan authored an email to Cullum, Morrow, and Ireland, reporting on what Fagan characterized

as a "dangerous" statement that Plaintiff had purportedly made at a meeting with the client.

(Fagan Dep., at 130-31; Kreisberg Decl., Ex. M, at ECF 3.)  The statement made by Plaintiff, as

described by Fagan, was that, during the time when Plaintiff was on PTO, "nothing was done"

on an Excel spreadsheet for the project, referred to as the "Delta list."  (*See* Fagan Dep., at 130.)

Fagan testified that he was "not sure" if Plaintiff's comment had been intended to refer only to a

"small component" of the Delta list, but, based on "the way it was said," the "connotation was

that nothing was done."  (*Id.*, at 131.)   Fagan also testified that he was "upset" that Plaintiff had

made the statement, as "it was a black eye with the customer" and had to be "unw[ou]nd."  (*Id.*)

In Fagan's email, he wrote that he had had to "step in an[d] retract" Plaintiff's statement, which

he described as untrue, as Olga had performed work on the Delta list while Plaintiff was out on

PTO.  (Kreisberg Decl., Ex. M, at ECF 3.)  Fagan also wrote that it had "become too detrimental

to have two architects on a call, especially if they [were] out of sync when in front of the client,"

and expressed the view that, "for now," "[Olga] need[ed] to be the clear lead."  (*Id.*)

### 5.   Plaintiff's Termination

Plaintiff was discharged by the Company on or about January 5, 2018.  (Def. 56.1 Stmt.

¶ 34; Pl. 56.1 Stmt. ¶ 34.)  The record contains a series of email exhanges among Cullum,

---

[20] Although the deposition testimony consistently refers to this other architect only as
"Olga," it appears from Defendant's Rule 56.1 Statement and from emails in the record that her
surname is Heyshkevich.  (*See* Def. 56.1 Stmt. ¶ 26; *see also* Reilly Decl., Ex. 13, at ECF 7,
Ex. 14 (Dkt. 32-14), at ECF 3.)

Sheedy, Morrow, Fagan, and Martin leading up to Plaintif's termination (*see* Kreisberg Decl.,

Exs. M, N), although many of those emails have not been authenticated and the information

therein – to the extent it has not been separately confirmed by its author, either in deposition

testimony, or in a statement sworn or made under penalty of perjury – would constitute

inadmissible hearsay, if offered for the truth.  Nonetheless, regardless of admissibility issues, the

salient parts of the most relevant of these emails may be summarized as follows:

### Cullum Email of December 21, 2012

> On December 21, 2012, Cullum told Sheedy (to whom Cullum
> directly reported (*see* Sheedy Dep., at 16)) that there would "no
> longer [be] a role for [Plaintiff] in [the Service Transition
> department]" when Plaintiff returned from his PTO and that
> Cullum did not believe there would be a need for him "any place
> else" in the Company (Kreisberg Ex. M (Dkt. 24-14), at ECF 2).
> Cullum then inquired as to whether the Company should be
> "mak[ing] the start to remove him."  (*Id*.)

### Emails from Cullum and Martin on December 31, 2012

> On December 31, 2012, Cullum told Sheedy, Martin, and Fagan
> that certain points needed to be raised with Plaintiff when Plaintiff
> returned, including that he had "not complete[d] [certain work] to
> an acceptable standard before going on holiday"; that he had
> informed a client that the company "had not completed work when
> in fact it had"; that he had a "[c]ontined lack of physical presence
> in meetings"; and that he was "[n]ot turning up at [9:00 a.m.] each
> day" (refererencing the door logs).  (*Id.*, at ECF 1-2.)  This email
> also indicated that Plaintiff would no longer go to 17 State Street
> (one of Defendant's offices) for meetings, and stated:  "This is a
> fundamental problem in terms of not being present when needed
> for certain meetings that should be in person."  (*Id.*, at ECF 2.)

> On that same date, in response to Cullum's email and apparently
> based on the representations made by Cullum, Martin wrote, "Is he
> [Plaintiff] needed, can we terminate?  It doesn't seem like there is
> any way to correct this behavior with him."  (*Id.*, at ECF 1.)

**Email String of January 2, 2018**

At 6:30 a.m. on January 2, 2018, Fagan responded to Martin by stating that it was his understanding that Plaintiff no longer wanted to work in the Service Transition department, but would continue to do work for that department, specifically on the Moody's project, until his work on that project was completed.  (*See id*. (*see also* duplicate copy of email at Kreisberg Decl., Ex. N (Dkt. 24-15), at ECF 4).)  Fagan continued that, "[a]t this point," the department was "far enough along" and had "enough coverage in place" to "complete the project."  (*Id*.)  He also stated that Plaintiff's behavior (apparently referencing the description that had been provided by Cullum) "sp[oke] for itself from  [a Service Transition] perspective," but Fagan nonetheless inquired as to whether – in light of Plaintiff's "8+ years" of service" – there was "another role available to him in the org[anization]."  (*Id*.)  On this point, Fagan also asked whether Plaintiff had "been able to make progress on finding another spot" in the Company.  (*Id*.)

At 10:12 a.m. that day, Martin responded to Fagan's inquiry by stating:  "Honestly with the attitude [Plaintiff] has had I am not sure why we would want to put him into another group either." (Kreisberg Decl., Ex. N, at ECF 3.)  At 10:58 a.m., Cullum responded to Martin by stating, "Agreed but I will leave that decision with [Sheedy] as he had the last conversation with [Plaintiff] about moving."  (*Id*.)  At 11:00 a.m., Sheedy responded, "Part ways – but let's do so with the least amount of turbulence as possible.  I have no place for him in my org[anization]."  (*Id*.)

At 4:14 p.m., Cullum asked Martin how to proceed, and, at 5:14 p.m., Martin – after asking, "I assume we have enough documentation and supporting information to back our claim?" – suggested that Plaintiff be terminated by the end of that week, although, "given his tenure," that he be "cover[ed]" with pay through the end of February.  (*Id*., at ECF 2.)  At 5:18 p.m., Cullum responded to Martin by stating, "I have provided everything we have[,] but essentially the bottom line is that [Plaintiff] asked to be moved from [the Service Transition department] and[,] given we have no other position for him, we feel it is best to depart [C]ompany with a payment up to [the] end of Feb[ruary] as a gesture of good will.  That should work[,] right?"  (*Id*., at ECF 1-2.)

Finally, at 7:02 p.m., apparently following up on the string from earlier that day, Fagan wrote to propose the explanation that should be provided to Plaintiff for his termination, and to make sure the

group had "all of [its] 'ducks in a row.'"  Noting that "we want to
make this situation as clean and as simple as possible," Fagan
wrote:  "We can get into all the issues we experienced with
lateness, missed meetings, water cooler gossip, miscommunication
to the client, etc., but at the end of the day, it seems [Plaintiff] is no
longer happy working for [the Company] in the Service Transition
team."  Fagan then went on to say, "My feeling is that we make the
explanation short and sweet to protect not only [Plaintiff's]
interests in trying to find another role outside of [the Company],
but to protect the firm."  He then provided bullet points, outlining
the following points:  that Plaintiff was an "at-will" employee,
such that the Company had no contractual obligation to him; that
Plaintiff "had agreed to finish his work for the Moody's project as
part of the service transition team"; that they had reached "a point
in the project where [] the majority of the design [was] completed"
and they had "other resources that [could] finish the remaining
work"; and that "[u]nfortunately, [Plaintiff] [was] no longer
needed within Service Transition and currently there [was] no
other spot for him in another part of the organization," such that
there was "no longer a position [] for him at [the Company]."
Fagain added, "We can certainly get into all the details if we need
to, but it will drive more angst and hostility."  (*Id.*, at ECF 1.)

Ireland informed Plaintiff of his termination in a meeting that was recorded, and a

transcript of that recording (reportedly made by Plaintiff) has been provided by to the Court by

Plaintiff, in opposition to Defendant's motion.  (*See* Reilly Decl. ¶ 19; *id.*, Ex. 15 (Dkt. 32-15).)

Based on that uncertified transcript – the accuracy of which has not been challenged by

Defendant – Ireland gave Plaintiff the following reason for his termination:

From our perspective, [] you've made it quite clear obviously that
you no longer want to be part of [S]ervice [T]ransition and we
obviously have accepted that fact.  Unfortunately, there are no
other positions in the [C]ompany available for you outside of
[S]ervice [T]ransition.  And the fact right now is that Moody's is
coming to a close from an architectural perspective and Olga is
taking over.

There is no longer any need for your position, and so we've
decided to let you go.

(Reilly Decl., Ex. 15, at ECF 5.)

Plaintiff's counsel apparently played the recording of at least this part of the meeting for Ireland at his deposition, and, although Ireland had initially testified that Plaintiff had not been fired, but rather left the Company voluntarily (*see* Ireland Dep., at 144-45), he amended that testimony upon hearing his voice on the recording, and confirmed that that he had "actually terminated [Plaintiff]" (*id.*, at 167-68.  As to his statement to Plaintiff that there were no other positions available for Plaintiff outside of the Service Transition department, Fagan testified that he had not made that statement from his own personal knowledge, but rather had been told this by either Cullum or Sheedy.  (*See id.*, at 169-71.)  When Sheedy, however, was asked at his deposition whether he knew "if anyone from [the Company] reached out to other departments to see if they thought [Plaintiff] would be a right fit for something else, Sheedy testified, "I don't know the details around that."  (Sheedy Dep., at 189-90.)

On the question of whether, in fact, other positions in the Company might have been available for Plaintiff, the record contains evidence that Plaintiff's skills could have been utilized in another department.  On this point, Fagan testified that he considered Plaintiff to have been a "highly skilled" architect, and that Plaintiff "would have been able to perform work in the [A]pplications department, the R&D department, and other departments" within the Company. (Fagan Dep., at 135.)  Certainly, the record reflects that Gabriel, at least, was quite interested in making Plaintiff a member of the Applications department, which Gabriel headed.  Gabriel testified at length that he had worked with Plaintiff (*id.*, at 25-26, 64); that he had had an opportunity to observe Plaintiff's work and was of the opinion that was of good quality (*id.*, at 30-31, 38-39); that he had no problems with Plaintiff's working from home two days a week (*id.*, at 49 (testifying, "you can work anywhere, as long as you're responsive")); that he had never found Plaintiff to be unresponsive or unavailable for meetings when working from home (*id.*, at

35-37); that Gabriel's department had availability (*id.*, at 43); that, in particular, a monitoring

team that was being formed in the Applications department needed an architect (*id.*, at 42); that

there would have been work for Plaintiff to do for the entire year of 2018, had he transferred into

the department (*id.*, at 47); and that Gabriel particularly wanted Plaintiff to join the Applications

department because he wanted someone with knowledge of the client (*i.e.*, Moody's) for which

the department was engaged in work (*id.*, at 46).

Despite the fact that Plaintiff had written to HR in October 2017 to request a transfer

(Kreisberg Decl., Ex. H), Gabriel further testified that, during the period from October through

December of 2017, neither Sheedy nor Cullum reached out to him about Plaintiff's potentially

transferring to the Applications department, and Gabriel also did not recall any conversations on

the subject with Ireland, Fagan, or HR (Gabriel Dep., at 39-41). Gabriel did not, himself, reach

out to Plaintiff's supervisors on the subject because he believed that Plaintiff was separately

speaking to them about it. (*See id.*, at 44.) Nonetheless, Gabriel testified that he sought to

intervene in Plaintiff's termination by telling Cullum, either on the day that Plaintiff was fired or

the day before, that he wanted Plaintiff "moved into the applications team." (*Id.*, at 45.) There is

evidence in the record suggesting that, in order for Plaintiff to have been transferred to another

department, the transfer would have had to have been approved by Cullum. (*See* Fagan Dep.,

at 160.)

The meeting in which Plaintiff was discharged by Ireland was also attended by

Lisa Bracco ("Bracco"), who worked in HR. (*See* Reilly Decl., Ex. 15; Sheedy Dep., at 64,

193).) The record contains a letter from Bracco to Plaintiff, dated January 5, 2017, that was

seemingly written after the meeting. (Kreisberg Decl., Ex. O (Dkt. 24-16).) In that letter,

Bracco did not provide the same explanation for Plaintiff's termination as had been given at the

meeting, but rather stated: "I regret to inform you that your employment with [the Company] will be terminated for unsatisfactory performance, as discussed today." (*Id*.)  The parties have presented no deposition testimony or other admissible evidence from Bracco to explain what she meant by "unsatisfactory performance."

###### B.  **Procedural History**

Plaintiff commenced this action by filing his Complaint on November 15, 2018 (*see* Compl.), alleging that he was discriminated and retaliated against on the basis of his disability and also discriminated against based on his race (*see generally id.*).  Defendant filed an Answer on January 2, 2019 (Dkt. 5), and, upon the parties' consent, the matter was referred to this Court for all purposes on April 22, 2019.  (Dkt. 14).

On September 9, 2020, following the completion of discovery, Defendant filed its motion for summary judgment (Dkt. 23), attaching its Local Civil Rule 56.1 Statement to its Notice of Motion (*see* Pl. 56.1 Stmt. (Dkt. 23-1)).  In further support of its motion, Defendant also submitted an attorney declaration with exhibits (Kreisberg Decl. (Dkt. 24) and exhibits thereto), and a memorandum of law (Defendant's Memorandum of Law in Support of Its Motion For Summary Judgment Dismissing the Complaint, dated Sept. 2, 2020 ("Def. Mem") (Dkt. 25)).  In its motion, and focusing on Plaintiff's termination, Defendant principally argues that "the undisputed facts establish that Plaintiff was discharged as an employee of [Defendant] for legitimate, non-discriminatory, business reasons unrelated to his claimed disability or race and that no reasonable jury could conclude otherwise."  (Def. Mem., at 1 (footnote omitted); *see also id.*, at 12-13.)

Plaintiff filed papers in opposition to the motion on October 9, 2020, including a responsive Local Civil Rule 56.1 Statement (Pl. 56.1 Stmt. (Dkt. 33), an attorney declaration

with exhibits (Reilly Decl. (Dkt. 32) and exhibits thereto), and a memorandum of law (Plaintiff's

Memorandum of Law in Opposition to Defendant's Motion For Summary Judgment, dated

Oct. 6, 2020 ("Pl. Mem.") (Dkt. 31).  In his opposition, as noted above, Plaintiff indicates that he

wishes to withdraw his race-based claims.  (*See supra*, at n.1.)  As to his disability-based claims,

however, Plaintiff challenges the admissibility of much of the documentary evidence submitted

by Defendant – contending that it is both largely unauthenticated and, in many instances,

constitutes hearsay that may not be considered in the context of a summary judgment motion –

and further contends that the full discovery record contains evidence from which a reasonable

juror could find in his favor.  (*See generally* Pl. Mem.)

On October 29, 2020, Defendant filed a reply memorandum (Defendant's Reply

Memorandum of Law in Support of Its Motion for Summary Judgment, dated Oct. 29, 2020

("Def. Reply Mem.") (Dkt. 34)), essentially reiterating the arguments made in its moving papers

(*see generally* id.).

## DISCUSSION

I.   **APPLICABLE LEGAL STANDARDS**

A.   **Summary Judgment**

1.   **Rule 56**

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment

should be granted "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Continental, Inc.*, 95 F.3d

123, 128 (2d Cir. 1996).  The moving party bears the burden of showing that no genuine issue of

material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  This burden may be

satisfied "by pointing out the absence of evidence to support the non-movant's claims." *Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 710 (2d Cir. 1991) (citing *Celotex*, 477 U.S. at 325).

Once the movant meets this burden, the non-moving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322-23). Specifically, the non-moving party must cite to "particular parts of materials in the record" or show "that the materials cited [by the movant] do not establish the absence . . . of a genuine dispute" as to any material fact. Fed. R. Civ. P. 56(c)(1). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Rather, a plaintiff opposing summary judgment "must lay bare his [or her] proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 408 (S.D.N.Y. 2003) (internal quotation marks and citations omitted); *see Smith v. Menifee*, No. 00cv2521 (DC), 2002 WL 461514, at *3 (S.D.N.Y. Mar. 25, 2002) (holding that the non-moving party must present "significant probative evidence tending to support the complaint" (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968))).

The evidence submitted by the parties in support or opposition to a motion for summary judgment must be in admissible form. *See, e.g.*, *Olsson v. Vertis Commc'ns*, No. 09cv05428 (GBD) (RLE), 2010 WL 5422514, at *2 (S.D.N.Y. Dec. 23, 2010) ("[o]n a summary judgment motion, the district court properly considers only evidence that would be admissible at trial"

(citing *Nora Bevs., Inc. v. Perrier Group of Am. Inc.*, 164 F.3d 736, 746 (2d Cir. 1998))).

Hearsay may not be considered by the court, *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 361 (S.D.N.Y. 2006), and unauthenticated emails "cannot support a summary judgment motion," *Olsson,* 2010 WL 5422514, at *2.

In reviewing the evidentiary record, the court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his [or her] favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001). If, even viewed in this light, there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," or if the "evidence is not significantly probative," summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## 2. Local Civil Rule 56.1

Under this Court's rules, a party moving for summary judgment must submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," Local Civ. R. 56.1(a), and the opposing party must submit a correspondingly numbered statement in response, additionally setting out, if necessary, material facts showing genuine triable issues, *see* Local Civ. R. 56.1(b). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely

solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement; it also must be satisfied that the moving party's assertions are supported by the record.  *See Vt. Teddy Bear Co. v. 1-800 Beargram Co*., 373 F.3d 241, 244 (2d Cir. 2004); *see also Zerafa v. Montefiore Hosp. Hous. Co*., 403 F. Supp. 2d 320, 329 n.12 (S.D.N.Y. 2005).

    **B.**    <u>**ADA Standards**</u>

        **1.**    <u>**Failure-To-Accommodate Claims**</u>

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.SC. § 12112(a); additional citation omitted).  Separately, the ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Accordingly, as formulated by the Second Circuit, a plaintiff may make out a *prima facie* case of discrimination under the ADA by showing that:

> (1) [P]laintiff is a person with a disability under the meaning of
> the ADA; (2) an employer covered by the statute had notice of his
> disability; (3) with reasonable accommodation, plaintiff could
> perform the essential functions of the job at issue; and (4) the
> employer has refused to make such accommodations.

*McBride*, 583 F.3d at 97 (internal quotation marks and citation omitted; alteration in original); *accord McMillan v City of New York*, 711 F.3d 120 (2d Cir. 2013).

For purposes of the third element, a "reasonable accommodation" may include, *inter alia*, "job restructuring," or "part-time or modified work schedules."  42 U.S.C. § 12111(9).  The question of what is "reasonable" in the particular circumstances presented "is necessarily fact-specific," *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996), and, on the

issue of "reasonableness," the plaintiff "bears only a light burden of production that is satisfied if the costs of the accommodation do not on their face obviously exceed the benefits." *McBride*, 583 F.3d at 97 n.3.

A reasonable accommodation, though, "can never involve the elimination of an essential function of a job." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003). "Although a court will give considerable deference to an employer's determination as to what functions are essential, there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions." *McMillan*, 711 F.3d at 126; *see also Sivio v. Village Care Max*, 436 F. Supp. 3d 778, 791 (S.D.N.Y. 2020) (discussing regulations promulgated by the EEOC that provide guidance on when a job function may be found to be "essential"). As the inquiry is fact-intensive, no one factor is dispositive, *id.* (citing *Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)), but, as particularly relevant here, "evidence of whether a particular function is essential includes . . . [t]he work experience of past incumbents in the job," 29 C.F.R. § 1630.2(n)(1).

If a plaintiff is able to make out a *prima facie* case of a failure to accommodate, then "the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship." *Sivio*, 436 F. Supp. 3d at 790 (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 12112(b)(5)(a) (providing that the failure to provide a reasonable accommodation will violate the statute, "unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]"). "Undue hardship" is defined under the ADA as "an action requiring significant difficulty or expense," 42 U.S.C. § 12111(10), in light of certain statutory factors, *id.* The specified factors include: (1) the "nature and cost" of the needed accommodation; (2) the

"overall financial resources of the facility or facilities involved," the "number of persons employed at such facility," the "effect [of the accommodation] on expenses and resources" or the "impact otherwise of [the] accommodation upon the operation of the facility"; (3) the employer's "overall financial resources," the "overall size" of its business "with respect to the number of its employees," and the "number, tupe, and location of its facilities; and (4) the "type of operation[s]" of the employer, including its "composition, structure, and functions of [its] workforce," and the "geographical separateness, administrative, or fiscal relationship of the facility or facilities in question to the [employer]." *Id.* Further, "undue hardship" is a "relational term" that "looks not merely to the costs that the employer is asked to assume, but also the benefits to others that will result." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995).

## 2.   **Discrimination Claims Based on Adverse Employment Actions**

A plaintiff may also claim discrimination under the ADA by reference to a particular adverse employment action, such as a job termination.  Such claims "are subject to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Wagner v. Inter-Con Sec. Sys., Inc.*, 278 F. Supp. 3d 728, 734 (S.D.N.Y. 2017).  To prevail on such a claim, a plaintiff must first make out a *prima facie* case by showing that

> (1) [his] employer is subject to the ADA; (2) [he] was disabled
> within the meaning of the ADA; (3) [he] was otherwise qualified
> to perform the essential functions of [his] job, with or without
> reasonable accommodation; and (4) [he] suffered [an] adverse
> employment action because of h[is] disability.

*McCrain v. Metro. Transportation Auth.*, No. 17cv2520 (RA), 2020 WL 1285634, at *13 (S.D.N.Y. Mar. 18, 2020) (citing *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)

(alterations in original)).  With respect to the fourth element (relating to causation), the plaintiff must not only "'demonstrat[e] that he suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent,'" *Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*, No. 11-CV-2920 (KAM), 2020 WL 5820327, at *6 (E.D.N.Y. Sept. 30, 2020) (quoting *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (Summary Order)), but must present evidence capable of showing that his disability was the but-for cause of the adverse employment action, *see McCrain*, 2020 WL 1285634, at *13 (citing *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019)).  Nonetheless, the burden of making out a *prima facie* case is "not onerous," and "has been frequently described as minimal." *Genova v. County of Nassau*, No. 17-cv-4959 (SJF) (AYS), 2020 WL 813160, at *6 (E.D.N.Y. Feb. 19, 2020) (adopting report and recommendation) (citations omitted).

If a plaintiff presents evidence sufficient to make out a *prima facie* case of disability discrimination, then the burden shifts to the defendant to proffer a "legitimate, nondiscriminatory reason" for the challenged action.  *Brizzi v. Utica Mut. Ins. Co.*, No. 18-CV-4973 (RRM) (RER), 2021 WL 1163112, at *7 (E.D.N.Y. Mar. 26, 2021) (citing *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 128-29 (2d Cir. 2012)).  The plaintiff then bears the burden of demonstrating that the defendant's proffered reason was "merely a pretext" for discrimination. *Kornmann v. City of New York Bus. Integrity Comm'n*, 467 F. Supp. 3d 54, 61 (E.D.N.Y. 2020). "Thus, at the summary judgment stage, a plaintiff must present evidence from which a reasonable fact-finder could conclude that, but for the claimed disability, [the claimed] adverse action would not have taken place."  *Genova*, 2020 WL 813160, at *6 (citing *Natofsky*, 921 F.3d at 351).

42

### 3.     **Retaliation Claims**

The same *McDonnell Douglas* burden-shifting framework discussed above applies in the

ADA retaliation context.  *McCrain*, 2020 WL 1285634, at *15 (citing *Treglia v. Town of*

*Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  To make out a *prima facie* case of retaliation under

the ADA, a plaintiff must present evidence showing:

> (1) [his] participation in a protected activity; (2) that [his]
> employer knew of the protected activity; (3) an adverse
> employment action; and (4) [that] a causal connection exist[ed]
> between the protected activity and the adverse employment action.

*Littlejohn v. City of N.Y.*, 795 F.3d 297, 315-16 (2d Cir. 2015) (internal quotation marks and

citation omitted); *see also Sivio*, 436 F. Supp. 3d at 799.

With respect to the first element of the *prima facie* case, "protected activity" under the

ADA can include both requesting an accommodation for a disability and complaining of conduct

believed to have been discriminatory.  *See Sivio*, 436 F. Supp. 3d at 801 (noting that plaintiff's

"requests for accommodation and the filing of her EEOC complaint [were] both protected

activities" (citations omitted)).

As for the causation requirement contained in the fourth element, a plaintiff must show

that his disability was the "but-for cause" of the retaliation, *Bailey v. Mount Vernon City School*

*District*, No. 17cv9973 (KMK), 2020 WL 1528481, at *12 (S.D.N.Y. Mar. 30, 2020) (citing

*Natofsky*, 921 F.3d at 348-49), and "that the allegedly adverse actions occurred in circumstances

from which a reasonable jury could infer retaliatory intent," *McCrain*, 2020 WL 1285634, at *15

(citation omitted).

If the plaintiff is able to establish a *prima facie* case, then a presumption of retaliation is

created and the burden shifts to the employer to articulate a "legitimate, non-retaliatory reason"

for the adverse employment action.  *Id.*  If the employer articulates a non-retaliatory explanation

for its conduct, then the presumption of retaliation is eliminated, and the plaintiff must be able to demonstrate that the proffered, non-retaliatory reason was a mere pretext for retaliation. *Piligan v. Icahn School of Medicine at Mount Sinai*, No. 17cv1975 (ALC) (SDA), 2020 WL 6561663, at *7 (S.D.N.Y. Apr. 7, 2020) (citation omitted), *report and recommendation adopted*, 490 F. Supp. 3d 307 (Sept. 28, 2020).

### C.   NYSHRL and NYCHRL Standards

Failure-to-accommodate claims brought under the NYSHRL and the NYCHRL are generally analyzed under the same standards as those that apply to the ADA.  *See Sivio*, 436 F. Supp. 3d at 790 (citation omitted); *see also Lawtone-Bowles v. City of New York*, No. 17cv8024 (WHP), 2019 WL 652593, at *6 (S.D.N.Y. Feb. 15, 2019) ("Courts apply the same standard for failure to accommodate cases under the ADA, . . . NYSHRL, and NYCHRL."). There are, however, some differences among federal, state, and local law with respect to discrimination and retaliation claims based on events such as an employee's termination.

When faced with such claims brought under the NYSHRL, the court again – as with analogous ADA claims – applies the burden-shifting framework of *McDonnell Douglas.  See Nieblas-Love v. New York City Housing Authority*, 165 F. Supp. 3d 51, 69-70 (S.D.N.Y. 2016). Accordingly, under the state law, a plaintiff must establish a *prima facie* case; the employer must offer a legitimate non-discriminatory or non-retaliatory reason for its action; and the plaintiff must then produce evidence and "carry the burden of persuasion that the proffered reason is a pretext." *Jun Kong v. Wing Keung Enterprises, Inc.*, No. 15-CV-6228 (RJD) (LB), 2017 WL 6025281, at *3 (E.D.N.Y. Aug. 9, 2017) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

In evaluating discrimination claims under the ADA and the NYSHRL, courts have generally described the elements constituting a *prima facie* case in identical terms.  *See, e.g.*, *Logan v. Saks & Co., LLC*, No. 18cv9023 (AT), 2020 WL 5768322, at *6 (S.D.N.Y. Sept. 28, 2020) (setting out elements of *prima facie* case of discrimination under the NYSHRL).  Unlike the ADA, however, a plaintiff asserting a discrimination claim under the NYSHRL does not need to show, in connection with the fourth element (*i.e.*, that the plaintiff suffered an adverse employment action "because of his disability") that discriminatory animus was the "but-for" cause of the adverse employment action, but rather only that it was "motivating factor" in the employer's decision.  *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 326 (S.D.N.Y. 2020).  Relatedly, if the defendant employer proceeds to proffer one or more legitimate, non-discriminatory reasons for the adverse employment action, the plaintiff asserting a claim under the NYSHRL is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision. *Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 328 (S.D.N.Y. 2020) (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008)).

On the other hand, most courts considering the question have found that the state law *does* require proof of "but-for" causation for a *retaliation* claim.  *See Maynard v. Montefiore Med. Ctr.*, No. 18cv8877 (LAP), 2021 WL 396700, at *6 (S.D.N.Y. Feb. 4, 2021) (noting that, "[a]lthough the [New York] Court of Appeals has not held explicitly that but-for causation governs NYSHRL [retaliation] claims, it has implicitly applied that standard on several occasions."  (citing *Smith*, 440 F. Supp. 3d at 340 n.22 (collecting cases))).  Thus, federal courts have applied identical standards when evaluating retaliatory-discharge claims brought under the

ADA and the NYSHRL.  *Thomson v. Odyssey House*, No. 14-CV-3857 (MKB), 2015 WL

5561209, at *19 (E.D.N.Y. Sept. 21, 2015), *aff'd*, 652 F. App'x 44 (2d Cir. 2016).

As for the NYCHRL, the city law is more generous to plaintiffs than either the ADA or

the NYSHRL.  Under the city law, which must be construed "liberally for the accomplishment of

the uniquely broad and remedial purposes thereof," *Marseille v. Mount Sinai Health Sys., Inc.*,

No. 18cv12136 (VEC), 2021 WL 3475620, at *5 (S.D.N.Y. Aug. 5, 2021), occurrences in the

workplace need not rise to the level of an "adverse employment action" to be actionable, on

either a discrimination or retaliation claim.  Rather, to make out a *prima facie* case of

discrimination under the NYCHRL, a plaintiff need only show that

> (1) [he] is a member of a protected class; (2) [he] [was] qualified
> for [his] position; (3) [he] was treated differently from others in a
> way that was more than trivial, insubstantial, or petty; and (4) that
> [he] was treated differently than a worker who was not a member
> of [his] protected class.

*Id*. (citing *Maynard*, 2021 WL 396700, at *5).  Despite this liberal standard, though, a plaintiff

asserting discrimination under the NYCHRL must still "show that the complained-of conduct

[was] caused by a discriminatory motive."  *Id.* (citing *Mihalik v. Credit Agricole Cheuvreux*

*N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (alterations omitted)).  To meet his initial burden,

the plaintiff need only demonstrate "differential treatment – that he [was] treated 'less well' –

because of a discriminatory intent."  *Id.*  Ultimately, "prevailing under the NYCHRL requires

showing that the protected trait was . . . a 'motivating factor'" of the employer's action.

*Espinosa v. Weill Cornell Medical College*, No. 18cv11665 (AT), 2021 WL 1062592, at *7

(S.D.N.Y. Mar. 19, 2021).

As for retaliation claims, rather than needing to prove any adverse employment action,

the plaintiff proceeding under the NYCHRL must only prove that "something happened that

would be reasonably likely to deter a person from engaging in protected activity." *Maynard*, 2021 WL 396700, at *6 (citing *Benzinger v. Lukoil Pan Americas*, *LLC*, 447 F. Supp. 3d 99, 129 (S.D.N.Y. 2020)).  In addition, as with discrimination claims under the city law, the plaintiff asserting a retaliation claim under that law need not show but-for causation," *id.*, but only that retaliation factored into the decision at issue, *see id.* (holding that summary judgment on a NYCHRL retaliation claim "is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision" (quoting *Dodd v. City Univ. of N.Y.*, No. 17cv9932 (PAE), 2020 WL 5750715, at *37 (S.D.N.Y. Sept. 25, 2020) (internal quotation marks omitted))).

## II.   DEFENDANT'S MOTION

### A.   Plaintiff's ADA Claims

Although the gravamen of Plaintiff's ADA claim (Count 1 of the Complaint) is not entirely clear, it appears to contain three component claims which should be separately parsed: first, that Defendant failed to provide Plaintiff with a reasonable accommodation for his disability, by substantially revoking his work-from-home schedule (*see* Compl. ¶¶ 53-54, 56; *see also id.* ¶¶ 27-33); second, that Defendant discriminated against Plaintiff, on the basis of his disability, by eventually terminating his employment rather than permitting him to continue to work from home (*see id.* ¶ 55); and, third, that Defendant retaliated against Plaintiff for exercising rights protected under the ADA – in particular, that Defendant terminated Plaintiff's employment because he "repeatedly request[ed] reasonable accommodations" (*see id.* ¶¶ 53-54).

In its motion, Defendant does not specifically argue that it is entitled to summary judgment on any claim that Plaintiff may be attempting to assert for the denial of a disability accommodation.  Indeed, nowhere, in either its moving or reply brief, does Defendant even

reference Plaintiff's apparent failure-to-accommodate claim, much less discuss or attempt to

apply the standards governing such a claim.  Rather, Defendant appears to construe Plaintiff's

claims as being based solely on his termination, and then concentrates its argument on Plaintiff's

allegations of discrimination, not retaliation.  More specifically, Defendant argues that it is

entitled to summary judgment dismissing Plaintiff's discriminatory-termination claim because

(1) that in light of the evidence in the record, Plaintiff cannot make out the fourth element of a

*prima facie* case of discrimination under the ADA (*i.e.*, that his termination occurred under

circumstances giving rise to an inference of discrimination), and (2) even if he could satisfy that

element, no reasonable jury could find that Defendant's legitimate, stated reason for Plaintiff's

termination was a pretext for unlawful discrimination.  (*See* Def. Mem., at 14 (making these

specific arguments with respect to Plaintiff's Title VII claim); *id.*, at 16 (arguing that, "[f]or the

same reasons that Plaintiff cannot prevail at trial on his Title VII disability claim, he cannot

pevail on his ADA claim either").[21])

---

[21] The Court notes that, in its moving brief, Defendant does not set out the standards
governing discrimination and retaliation claims under the ADA, but instead merely states that
"ADA claims are analyzed under the same standard" that Defendant had described for Title VII
claims.  (Def. Mem., at 15 (citing cases).)  In fact, there are differences between the Title VII and
ADA standards, most notably with respect to the standard of causation that must be satisfied to
demonstrate discrimination.  Under Title VII, a plaintiff asserting a discrimination claim is "not
required to show that the employer's proffered reasons [for the adverse employment action] were
false or played no role in the employment decision, but only that they were not the sole reasons
and that a prohibited factor was at least one of the 'motivating' factors" for the decision, *Smith*,
440 F. Supp. 3d at 328 (citing *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008)),
whereas, under the ADA, as set out above, a plaintiff must show that discrimination was the
"but-for" cause of the adverse action at issue (*see* Discussion, *supra*, at Section I(B)(2)).  On
retaliation claims, however, "but-for" causation must be demonstrated under both Title VII and
the ADA.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII
retaliation claims must be proved according to traditional principles of but-for causation, not the
lessened causation test [applicable to discrimination claims]"); *see also* Discussion, *supra*, at
Section I(B)(3).

For the reasons discussed below, the Court finds that summary judgment is precluded as to all of Plaintiff's disability-based claims, as the record reveals the existence of genuine, disputed issues of fact as to whether the substantial revocation of Plaintiff's work-from-home schedule represented the denial of a reasonable accommodation, and as to the reasons why Defendant ultimately terminated Plaintiff's employment.

>    **1.    The Record Reflects Triable Issues of Fact as to Whether Defendant Failed To Accommodate Plaintiff's Claimed <u>Disability by Largely Revoking His Work-From-Home Schedule.</u>**

The Court would be justified in denying summary judgment in Defendant's favor on Plaintiff's apparent ADA "failure-to-accommodate" claim for the simple reason that Defendant never squarely addresses such a claim in its motion. (*See generally* Def. Mem.; Def. Reply Mem.) Nonetheless, the Court has undertaken to review the evidence that has been presented, with an eye towards determining whether genuine issues of material fact exist with respect to this claim. Based on that review, the Court concludes that summary judgment is, in any event, not warranted on the claim.

>    **a.    Plaintiff Has Presented Evidence Capable of Making <u>Out a *Prima Facie* Case of a Failure To Accommodate.</u>**

As an initial matter, Plaintiff has come forward with evidence capable of making out a *prima facie* case of a failure to accommodate, under the ADA.

As to the first element (that Plaintiff "is a person with a disability under the meaning of the ADA"), Defendant expressly "does not contest" this, for purposes of its motion. (Def. Mem., at 1 n.1.)

As to the second element (that Defendant is an employer covered by the ADA, and that it had "notice" of Plaintiff's disability), Defendant has nowhere suggested that it is not covered by the ADA, and its seeming argument that it did not have notice of Plaintiff's claimed disability is

focused too narrowly on (a) whether the Company's HR department had received formal written notice of this, and (b) whether such notice was supported by medical documentation.  (*See* Def. Mem., at 2; Chen Decl. ¶ 2; Def. Reply Mem., at 2-3.)  The question of whether an employer has adequate notice of an employee's claimed disability does not turn on the form in which the notice was given (*i.e.*, oral or written), or on whether the notice was given to the employer's HR department (as opposed to the employee's supervisors), or on whether the notice was accompanied by medical support*.  See Kurlender v. Ironside Grp., Inc.*, No. 18-CV-3839 (JFB) (AYS), 2019 WL 1317405, at *3 (E.D.N.Y. Mar. 22, 2019) ("What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." (citation omitted)).  This is especially true in a case like this one, where the record shows that employees were advised, through the Company's employee handbook, that, to seek an accommodation, they "should speak with their manager or supervisor," and that the Company might then request medical documentation.  (Reilly Decl., Ex. 8, at ECF 15.)

As summarized above, Plaintiff has given unrefuted testimony that, at the time of his hire, he told an HR representative about his disability (*see* Pl. Dep., at 42, 44-45), and, beyond that, Plaintiff has testified that, over time, he orally informed multiple people at a management level – including several of his supervisors – of his medical condition and his resulting limitations (*see*, *e.g.*, *id.*, at 38 (testifying that he informed Ghicas that his disability made him unable to walk long distances or stand for long periods of time); *id.*, at 155-58 (testifying that, in discussing his role on a new project with Sheedy, Plaintiff made Sheedy aware of his disability, and confirmed that he would not have to go to data centers "because of the condition of [his]

foot"); *id.*, at 195 (testifying that both Case and McFadden were aware of the issues he had with

his feet); *id.*, at 178 (testifying that he informed Cullum of his foot condition and how it affected

his ability to commute); *see also id.*, at 198 (testifying that he had been "open and honest with

[Cullum] regarding . . . the issues that [he had] with both of [his] feet").  The only one of these

corporate witnesses to give deposition testimony was Sheedy, who testified that he could not

recall whether he had, or had not, engaged in such discussions with Plaintiff (*see* Sheedy Dep.,

at 70, 72-73, 75); thus, Defendant has presented no evidence, from anyone with personal

knowledge, capable of challenging Plaintiff's accounts.

Moreover, it is undisputed that, in an email to Cullum in May 2016, sent shortly after

Cullum took over as head of the Service Transition department, Plaintiff expressly stated – in

writing – that among the reasons he had been working from home were "foot issues," which

stemmed from his "disability back in 2005," and which made it difficult for him to have

"constant long commutes."  (Reilly Decl., Ex. 9, at ECF 3.)  In addition, Plaintiff's testimony

describing how, starting in 2013, he had been permitted by his supervisors to work from home, at

least in part because of his disability (*see, e.g.*, Pl. Dep., at 159-63), itself permits the inference

that Defendant was on notice that Plaintiff *had* a disability.  Defendant's repeated assertion that

the reason why Plaintiff first began working from home had nothing to do with any disability,

but rather with a lack of available space in the office (*see* Def. Mem., at 2, 5), is, at a minimum,

contested (*see* Pl. Dep., at 215-16 (testifying that, when Hurricane Sandy resulted in space

limitations in the office, his then-supervisor, Case, suggested giving Plaintiff's seat to someone

else, as Plaintiff was "already working from home anyway"); *see also* Reilly Decl, Ex. 9, at

ECF 2 (email from Plaintiff to Cullum, stating that Plaintiff had been working from home

"before they did not have any space in the office")).

As to the third element of the *prima facie* case (that, with a "reasonable accommodation," Plaintiff could have performed the "essential functions" of the Service Transition Architect position), Plaintiff has asserted that, because of his lengthy commute, he needed a work-from-home accommodation in order to be able to perform his job without undue pain, and Defendant has not directly challenged the reasonableness of the accommodation that Plaintiff sought.  It may be that, by contending that Plaintiff's "claimed disability of his feet [] allegedly prevented extended standing or walking, neither of which he was ever required to do as an information technology Engineer or Architect for the Company" (Def. Mem., at 13), Defendant is implicitly arguing that an accommodation that would have related only to Plaintiff's ability to *commute* to work (as opposed to his ability to perform his job, when on the job) would not have been "reasonable," but, if Defendant is actually trying to make such an argument, it has offered no support for its position.

In fact, the Second Circuit has made clear that the ADA is sufficiently broad to require accommodations that would reasonably enable disabled employees to reach their workplaces. Thus, in *Nixon-Tinkelman v. New York City Dep't of Health*, 434 F. App'x 17 (2d Cir. 2011) (Summary Order), the court reversed a grant of summary judgment that had been made by the district court on the grounds that "commuting [fell] outside the scope" of the plaintiff's job, *see id.*, at 19.  On this point, the Second Circuit held:

> Our case law establishes that in certain circumstances, an employer may have an obligation to assist in an employee's commute. Indeed, this Court has stated that 'there is nothing inherently unreasonable . . . in requiring an employer to furnish an otherwise qualified disabled employee with assistance related to her ability to get to work.' *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1517 (2d Cir. 1995); *accord DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) (suggesting that employer had provided a reasonable accommodation by allowing employee to work from home, which was 'necessary to maintaining his job').

*Id.* (also noting that "[d]etermining whether a particular commuting accommodation is reasonable normally involves a fact-specific inquiry" (citation omitted)); *see also Penird v. Better*, No. 5:19-CV-1146 (MAD/TWD), 2021 WL 3077853, at *8 (N.D.N.Y. July 21, 2021) (citing *Nixon-Tinkelman* for the proposition that, "in certain circumstances, an employer may have an obligation to assist in an employee's commute under the ADA . . . ."). [22]

On the separate question of whether Plaintiff could have performed the "essential functions" of his job with the accommodation he sought, the fact that he had been doing largely the same type of work, remotely, for years lends credence to his position that regular, in-person attendance, during the hours from 9:00 a.m. to 6:00 p.m., was not an essential job function. *See, e.g.*, *Varone v. City of N.Y.*, No. 02cv01089 (DFE), 2003 WL 21787475, at *15 (S.D.N.Y. Aug. 4, 2003) (fact that plaintiff was able to perform his job for 15 years with a flexible schedule precluded court from ruling, as a matter of law, that such a schedule would prevent him from performing the essential functions of the job); *see also* 29 C.F.R. § 1630.2(n)(3) (listing "[t]he work experience of past incumbents in the job" as relevant to determining whether particular job functions are essential). Although Ireland testified that "architects" were expected to play a greater role than "engineers" in mentoring junior members of the Service Transition department, and that this greater role required greater "visibility" in the office for the purpose of providing "technical leadership" (*see* Ireland Dep., at 105-06), this vague testimony is insufficient to

---

[22] Although Defendant does not argue the point, the Court notes that Plaintiff's statement in his May 24, 2016 email to Cullum that he had not imagined that he would need to go into the office every day until he received "a base Salary change" the following year (Reilly Decl., Ex. 9, at ECF 3) may raise a question as to whether Plaintiff actually needed an accommodation for his disability, and whether his requested accommodation was therefore reasonable. The Court cannot conclude as a matter of law, however, that the fact that Plaintiff was prepared to be in the office more regularly once his pay increased meant that he was not, in fact, physically disabled and entitled to a reasonable accommodation with respect to his commute.

suggest that Plaintiff's claims fails, as a matter of law, on this element of his *prima facie* case, especially in light of the testimony given by Stewart – the only witness to testify who was a more junior member of the department than Plaintiff, and who worked under his supervision. According to Stewart, he was mentored by Plaintiff, and Plaintiff's "very, very detailed" approach helped Stewart in the performance of his own job.  (*See* Stewart Dep., at 32-35.) Further, Stewart testified that he had no issue at all with Plaintiff's working from home.  (*See id.*, at 36.)

Finally, as to the fourth element (that Defendant refused to provide the work-at-home accommodation), there is ample evidence in the record that Cullum refused to allow Plaintiff to continue working full-time from home (the accommodation that Plaintiff claims to have sought) (*see* Reilly Decl., Ex.9, at ECF 2-4), and that, although Cullum did ultimately permit Plaintiff to work from home two days per week, he was inconsistent in this regard, repeatedly deprived Plaintiff of his scheduled work-from-home days, and made it clear that Plaintiff's working from home was disfavored (*see* Pl. Dep., at 182, 225-26).

> **b.    Defendant Has Not Demonstrated
> That the Proposed Accommodation
> Would Have Caused It Undue Hardship.**

As Plaintiff has shown that he can make out a *prima facie* case of a failure by Defendant to accommodate his disability, Defendant – in order to be granted summary judgment on the failure-to-accommodate claim – must demonstrate that the record reflects no genuine disputed issue as to whether the proposed accommodation would have caused it an "undue hardship." *Sivio*, 436 F. Supp. 3d at 790; 42 U.S.C. § 12112(b)(5)(a).  Other than recite inadmissible hearsay statements from Cullum, however, regarding purported difficulties caused to the Service Transition department by Plaintiff's supposed failure to be present, in person, for certain

meetings, Defendant has made no effort to show that it would have faced any hardship at all (much less "undue" hardship) from allowing Plaintiff to work full-time from home, or at least to work in the office at times that could have let him avoid standing on his long commute. Defendant has presented no evidence regarding the cost of the accommodation, the financial resources of the office or of the Company overall, the number of people employed at the relevant office(s) or by the Company, the effect of the accommodation on expenses and resources, or the impact of the accommodation on the office's or Company's operations. *See* 42 U.S.C. § 12111(10).

Moreover, the fact that Plaintiff was apparently able to work from home, successfully, for a number of years, and that others within the Company testified that this arrangement had caused no problems (*see* Stewart Dep., at 62-64, 76-78; Fagan Dep., at 56-57; Gabriel Dep., at 30-31, 35-39; *see also id.*, at 49 (testifying, "[Y]ou can work anywhere, as long as you're responsive.")), would tend to refute any evidence of "undue hardship," even had such evidence been presented.

For these reasons, the Court finds that there are genuine, material, triable issues of fact on Plaintiff's discrimination claim under the ADA, based on Defendant's alleged failure to accommodate Plaintiff's claimed disability.  Summary judgment on that claim must therefore be denied.

> ### 2. There Are Also Triable Issues of Fact as to Whether the Termination of Plaintiff's Employment Was Discriminatory or Retaliatory.

Plaintiff also asserts claims under the ADA that he was discharged from his position for (a) discriminatory and/or (b) retaliatory reasons.  (*See* Compl, ¶¶ 53-55.)  In its motion, Defendant expressly addresses only Plaintiff's claim for discriminatory termination, but, in any

event, Defendant has failed to demonstrate the absence of material factual disputes as to either

Plaintiff's discrimination or retaliation claim.

> **a.     Plaintiff Has Presented Evidence
> Sufficient To Satisfy the Elements of a
> *Prima Facie* Case of Discriminatory Termination.**

As to the *prima facie* showing that Plaintiff would need to make to support a claim for

discriminatory termination, Defendant does not contest that it is subject to the ADA, that

Plaintiff was disabled within the meaning of the statute, that he was "qualified" to perform his

essential job functions, or that he suffered an "adverse employment action" when his

employment was terminated.  (*See generally* Def. Mem.)  Rather, Defendant only challenges

Plaintiff's ability to demonstrate, as required by the fourth element of the *prima facie* case, that

he was discharged "because of his disability."  (*See id.*, at 14, 16.)

On this element, the record contains testimony from several witnesses that, when Cullum

came on board, he made it clear that he did not want to have members of his department working

from home, and instead wanted them present in the office, five days per week, from at least

9:00 a.m. to 6:00 p.m.  (*See* Gabriel Dep., at 50; Stewart Dep., at 36-37, 80; Fagan Dep., at 41,

71; Ireland Dep., at 26, 93-94.)  The record also contains testimony from Plaintiff that, despite

his having told Cullum that his prior work-from-home schedule related to a disability, Cullum

informed Plaintiff that he would not allow Plaintiff to continue working from home, but instead

expected him to be present in the office.  (Pl. Dep., at 173-75, 178; *see also* Reilly Decl., Ex. 9,

at ECF 3-4 (Cullum email, stating "Going forward, I would like to . .  ask for anyone who works

from home to now come back into the office"); *id.*, at ECF 2-3 (follow-up Cullum email, stating,

"I require my architects to be in the office").)

In addition, a fair inference may be drawn from the evidence, viewed in its entirety, that, after Cullum backed off from his initially stated position and permitted Plaintiff to work partially from home, this issue was the source of continuing and increasing strife between them, as Plaintiff tried to maintain some type of regular work-from-home schedule, and Cullum sought to secure Plaintiff's presence in the office with greater frequency.  It is not a far leap to infer from the evidence that, but for this strife – all rooted in Cullum's seeming belief that Plaintiff could not properly perform his job remotely, and Plaintiff's resistance to giving up his claimed accommodation – Plaintiff would not have been fired.  Given that Plaintiff's burden in making out the elements of a *prima facie* case is "minimal," *Genova*, 2020 WL 813160, at *6, the Court finds that the evidence he has presented in opposition to Defendant's motion is sufficient to satisfy his burden as to the fourth element.

> **b.** **Plaintiff Has Also Presented Evidence Capable of Demonstrating a *Prima Facie* Case of Retaliatory Termination.**

Although Defendant never explicitly discusses the elements of a *prima facie* case that Plaintiff would have to satisfy to prevail on a retaliatory termination claim, Defendant appears to contend that Plaintiff never engaged in "protected activity" and thus cannot satisfy the first element.  In this regard, Defendant repeatedly notes that, while Plaintiff made written complaints to HR and others about his treatment on the job (including complaints about his allegedly abusive treatment by Morrow in the October 4, 2017 meeting, and about his receipt of the allegedly unfair October 31, 2017 Warning Notice), he never complained of *discrimination*.  (*See* Def. Mem., at 6-7, Def. Reply Mem., at 4-5.)  In response to this point, Plaintiff highlights the fact that, when he complained about the Warning Notice by sending an email to HR (Reilly Decl., Ex. 13), he attached to that email his prior email to Cullum, explaining that he had

previously been working at home, in part, because of "foot issues" (*see id.*, at ECF 6; *see also* Pl. Mem., at 10-11).

It is, however, largely irrelevant whether this could be found sufficient to show that Plaintiff engaged in the protected activity of complaining of disability discrimination, as, based on the evidence discussed above, the record alternatively supports the conclusion that Plaintiff engaged in another type of protected activity – that of requesting an accommodation for a disability. *See, e.g.*, *Pacheco v. Park S. Hotel, LLC*, No. 12cv9127 (PAC), 2014 WL 292348, at *4 (S.D.N.Y. Jan. 27, 2014) ("[R]equests for accommodation constitute protected activity under the ADA[.]"); *accord Sivio*, 436 F. Supp. 3d at 801 (citing *Pacheco*). Indeed, the Complaint itself pleads that Plaintiff was retaliated against "for repeatedly requesting reasonable accommodations." (Compl. ¶ 53.)

As for the fourth element of the *prima facie* case (regarding causation), the Court finds that the same evidence that supports Plaintiff's claim that his termination resulted from discrimination also supports his claim that his termination resulted from retaliation, as, in each instance, the crux of Plaintiff's claim is that he was fired because of Cullum's antagonism towards the work-from-home accommodation that Plaintiff claims to have sought for his disability.

> ### c. Plaintiff Has Raised Genuine Issues of Fact as to Whether Defendant's Proffered Reasons For His Termination Were a <u>Pretext for Unlawful Discrimination or Retaliation.</u>

The record also reflects genuine disputed issues as to whether the non-discriminatory and non-retaliatory reasons proffered by Defendant for Plaintiff's discharge were a pretext for unlawful discrimination or retaliation.

First, the Court notes that the explanations that have been proffered by Defendant as to why Plaintiff's employment was terminated have been inconsistent, and an employer's shifting explanations for an employment decision can be indicative of pretext. *See Harrow v. St. Luke's Cornwall Hosp.,* No. 09cv7847 (CS), 2011 WL 13383216, at *5 (S.D.N.Y. Mar. 29, 2011) ("a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff" (citation omitted)), *aff'd,* 485 F. App'x 488 (2d Cir. 2012).

In this case, it appears to be undisputed that, at the meeting in which he was informed of the termination decision, Plaintiff was told that the Company had accepted the fact that he no longer wished to be part of the Service Transition department, but that there were no other positions in the Company that were available for him, outside of that department. (Reilly Decl., Ex. 15, at ECF 5.) Plaintiff was also apparently told, at that time, that the Moody's project was "coming to a close," and that there was "no longer any need for [his] position." (*Id.*) In contrast to this, the record also contains a letter to Plaintiff from an HR representative, seemingly written immediately following that meeting, but stating that Plaintiff was being terminated for "unsatisfactory performance." (Kreisberg Decl., Ex. O.) Further confusing the matter, Chen now states, in her Declaration, that:

> [t]he Company's HR department records reflect that [P]laintiff was discharged because of conflict between him and his supervisors, bad[-]mouthing of the Company by [P]laintiff to his co-workers, and a determination that the relationship between [P]laintiff and the Company had deteriorated to such an extent that his continued employment by the Company was untenable.

(Chen Decl. ¶ 6.) Further, in its moving brief, while Defendant echoes much of Chen's statements, it adds that, among the reasons for Plaintiff's discharge was that he had "ma[de] factually inaccurate statements to the client on the Company's then most important project that

certain work was not done by others in the Company on the project while he was on vacation when in fact such work was done by other Company employees," and that he had "create[ed] a general perception by Company management that he had developed a negative attitude about the Company." (Def. Mem., at 12-13.) Finally, in its reply brief, Defendant states that, among the reasons for the termination decision was that Plaintiff had been "a difficult employee, resistant to management and supervision, [and] borderline insubordinate to Company management," and that he had "exercised poor judgment in taking a vacation at an important time in the Company's work on its most important project." (Def. Reply Mem., at 6). The inconsistencies in Defendant's explanations over time, and even in Defendant's submitted arguments, at least raise a question as to the true reason for Plaintiff's discharge.

Second, beyond Fagan's testimony regarding a single inaccurate statement that Plaintiff purportedly made at a client meeting (Fagan Dep., at 130-31), there is little in the record to support many of the "reasons" that Defendant has variously proffered for Plaintiff's termination. Certainly, the record appears to reflect that, contrary to Defendant's initial statement to Plaintiff that, outside of the Service Transition department, there were no other positions in the Company that were available for him, there *was*, in fact, a position that Plaintiff could have filled in another department. On this point, Gabriel, who had headed the Applications department at the time, testified unequivocally that he had wanted to bring Plaintiff into his department, had an available position for him there, and even tried to intervene in Plaintiff's firing, so as to be able to transfer him into a role that Gabriel had envisioned for him. (*See* Gabriel Dep., at 42-46.)

There is also a notable dearth of admissible evidence in the record that Plaintiff had widely "bad-mouthed" the Company to co-workers. As set out above, the only employee who had supposedly heard any "gossiping" by Plaintiff was DeVries, who did not provide deposition

testimony or submit a sworn affidavit or declaration, leaving the record with no competent

evidence on the subject.  (*See* Background, *supra*, at Section A(4)(c).)  Similarly, Bracco did not

testify to explain the performance issues she referred to only vaguely in Plaintiff's termination

letter, and, to the extent the "unsatisfactory performance" referenced by Bracco may have been

intended to cover any issues regarding Plaintiff's supposed lack of responsiveness or availability

during his work-from-home days, or his supposed lateness to meetings (*see, e.g.*, Ireland Dep.,

at 69), there is no testimony in the record from any witness who claimed to have experienced

such problems first-hand.  As discussed above (*see* Background, *supra*, at Section A(4)(a)),

although Ireland testified that others, specifically including Fagan and Stewart, had come to him

with these types of complaints about Plaintiff, both Fagan and Stewart contradicted Ireland's

account, with both denying that they had ever found Plaintiff to be unresponsive, unavailable, or

late to meetings.  It should also be noted that Defendant's most recently asserted addition to its

stated reasons for Plaintiff's discharge – that he "exercised poor judgment in taking a vacation at

an important time" (Def. Reply Mem., at 6) – has not only been newly added to the mix on reply,

but is seemingly countered by the evidence in the record that Plaintiff's vacation time (*i.e.*, his

PTO) had been specifically approved by his supervisors (*see* Ireland Dep., at 78-80).

Third, the issue of a lack of admissible evidence to support Defendant's proffered

explanations for Plaintiff's discharge is particularly acute in this case because, based on the

record, it seems likely that it was Cullum who took the lead in advancing criticisms of Plaintiff

(and equally likely that others, including Sheedy and Martin, relied on Cullum's descriptions of

purported problems with Plaintiff's behavior or performance), but Cullum apparently gave no

deposition testimony or authored any sworn statement or declaration before he passed away.  It

appears that Morrow may have also played an integral role in laying the groundwork for

Plaintiff's termination, but the record also contains no testimony or admissible statement from

him.  Under the circumstances, the majority of the documents that Defendant has submitted in an

apparent attempt to put forward the knowledge of these critical witnesses – including Morrow's

written account of his October 4, 2017 meeting with Plaintiff (Kreisberg Decl., Ex. F, at

ECF 1-2) and the various emails authored by Cullum that preceded Plaintiff's termination (*see*

Background, *supra*, at Section A(5) (summarizing email strings submitted as Kreisberg Decl.,

Exs. M, N)) – simply cannot be considered by the Court for the truth of any statements contained

therein regarding the nature of Plaintiff's conduct.

Finally, although Defendant is unclear as to exactly what it now means by saying that

Plaintiff had "conflict" with his supervisors, or displayed "a negative attitude," or was

"difficult," or was "resistant to management and supervision," or was "borderline insubordinate,"

it appears from the record, as discussed herein, that any "conflict" between Plaintiff and

management may have arisen primarily from Plaintiff's desire to continue to work from home

and Cullum's lack of tolerance for remote work.  There is admissible evidence in the record that,

on one occasion, Morrow communicated that lack of tolerance in a particularly harsh way, with

criticisms that, according to Plaintiff (and other witnesses) were not valid, leading Plaintiff to

become upset.  (*See* Background, *supra*, at Section A(4)(a)-(b).)   If friction arises between an

employer and employee over the employee's assertion of protected rights under the ADA, the

employer cannot rely on the existence of that friction as a "legitimate" non-discriminatory and

non-retaliatory reason for taking action against the employee.

Accordingly, as Defendant has not demonstrated the absence of any material issue of fact

as to the reason(s) for Plaintiff's discharge, Defendant is not entitled to summary judgment

dismissing Plaintiff's discriminatory- and retaliatory-termination claims.

**B.**     **Plaintiff's State and Local Law Claims**

Given that the standards governing discrimination and retaliation claims under the

NYSHRL and the NYCHRL are, in no respect, stricter than those governing parallel ADA

claims, and, in some respects, are more generous to plaintiffs (*see* Discussion, *supra*, at

Section I(C)), the Court need not separately analyze whether Plaintiff's claims under the state

and city law can survive summary judgment.  In short, if Plaintiff has presented sufficient

evidence to warrant the denial of summary judgment as to his ADA claims, then, *a fortiori*, he

has presented sufficient evidence to warrant the denial of summary judgment as to his NYSHRL

and NYCHRL claims as well.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Complaint shall be deemed amended to exclude

his race-based claims, as those claims have now been voluntarily withdrawn.  As to Plaintiff's

disability-based claims, Defendant's motion for summary judgment (Dkt. 23) is denied.  The

Court will hold a telephonic case-management conference with counsel on September 29, 2021,

at 10:00 a.m., to set a schedule for trial submissions.  For that conference, counsel are directed to

call the following Toll-Free Number:  (877) 411-9748, and use Access Code:  9612281.  Prior to

the conference, however, counsel are directed to engage in good-faith settlement discussions, so

that they may report at the conference as to whether this case might be capable of resolution without trial.

Dated:  New York, New York
          September 17, 2021

                              SO ORDERED

                              _____
                              DEBRA FREEMAN
                              United States Magistrate Judge

Copies to:

All counsel (via ECF)